### DARLINGTON IRON CO. (Limited) v. FOOTE.

*(Circuit Court, S. D. New York. June 4, 1883.)*

**1. CONTRACT—BY CORRESPONDENCE—RULE OF LAW GOVERNING.**

It is an undoubted rule of law that before an agreement can be gathered from a correspondence it must appear by the correspondence that what has been proposed on the one side has been definitely agreed to upon the other, so that a clear and complete contract can be derived from the letters.

**2. SAME—APPLICATION OF RULE.**

Applying this rule, a contract cannot be considered as made until the latest proposition on the part of the one is assented to by the other of the parties.

**3. SAME.**

The contract should be deemed complete the moment the letter assenting to the proposed terms is mailed.

**4. SAME—BROKER ACTING AS PRINCIPAL.**

Where, in all the correspondence preliminary to a contract for the sale and purchase of rails, the proposed purchaser, a broker, was treated with as principal, and where, finally, in the bought and sold notes, exchanged by the parties, the broker was named as purchaser, the court *held* that he should be regarded as a principal, and that the contract contemplated by the parties was clearly one in which the broker was to be a principal.

**5. SAME—EXCHANGE OF "BOUGHT AND SOLD NOTES."**

In a case where bought and sold notes were to be exchanged by the parties to a contract, and in the same letter in which plaintiff had mailed the notes for signing he asked the defendant to "cable confirmation of the contract," *held*, that the confirmation was to be signified by the cablegram, and that the exchange of the bought and sold notes could not be considered as the preliminary to a contract, but as evidence of a contract already concluded.

At Law.

*Lawrence & Waehner,* for plaintiffs.

*Evarts, Southmayd & Choate,* for defendant.

WALLACE, J. Without attempting to recapitulate the propositions and counter-propositions contained in the correspondence by letters

and cablegrams between the parties, the conclusion is reached that the minds of the parties finally met, and they became reciprocally obligated in a contract.

On the fifth day of March, 1881, after many letters and cablegrams had been exchanged between the parties, the defendant wrote to plaintiff's agents: "I note our misunderstanding of each other's cablegrams. Subsequent acts have produced a correct understanding and removed doubtful details of the 10,000 tons contract." He further states, in substance, in that letter, that the parties who are to buy the iron rails of him have concluded to take the plaintiff's iron rails as bought of him; that he is daily expecting the credits which they have promised, and that he is only waiting for the credits in order to forward them with the written contracts as proposed between the parties.

In order to ascertain what was the "correct understanding" that had been reached, and what was meant by the credits and written contract which defendant was waiting to forward, the inquiry will be simplified by ignoring many of the letters and cablegrams which had been exchanged, and which do not throw light upon the question, but only serve to confuse its solution. On January 24, 1880, the defendant wrote to plaintiff's agents, embodying in his letter the contract he proposed, and confirming the sale to him of 10,000 tons Darlington iron rails, upon the conditions therein specified. These conditions were that the rails should correspond as to section with a tracing inclosed in the letter; should weigh 56 pounds per lineal yard; should be 28 to 30 feet in length; should be manufactured after a process described; and should be delivered at Middlesbro, England, commencing in April, and completed by September 1, 1880. The price was specified at nine pounds per ton, and was to be paid in cash on presentation of bills of lading, and invoice of each shipment, to an agent to be selected by defendant in London. On February 5th the plaintiff's agents replied to this letter, and, after explaining misunderstandings in the cablegrams that had passed between the parties, asked the defendant to confirm the contract, with modifications of his proposition. These modifications related to the section and the length of the rails. In that letter, "to avoid any possible mistakes," the plaintiff's agents inclosed "bought and sold notes" containing details of the contract, the sold note being signed by plaintiff, and requested defendant to sign and return to them the bought note. On the nineteenth of February the plaintiff's agents sent a cablegram to defendant receding from the modifications which they had

suggested in their letter of February 5th, and requesting defendant to cable confirmation of the contract. On the same day plaintiff's agents wrote to defendant reiterating their cablegram, and asking the defendant to correct the bought note they had inclosed in their letter of February 5th to correspond with the contract as then proposed, and forward it to them. March 1st plaintiff's agents cabled defendant requesting him to cable immediately the position of the contract. March 2d defendant replied by cable, stating that the position of the contract was satisfactory. March 5th the defendant mailed to plaintiff's agents the letter first adverted to.

Recurring now to the *status* of the negotiations as it was on March 2d, it appears that defendant had submitted originally a proposition (January 24th) to which the plaintiff's agents had proposed modifications, (February 5th,) from which modifications they had receded, and notified defendant (February 19th) by cablegram. When, on March 1st, plaintiff's agents cabled defendant, asking him to cable immediately the position of the contract, there was no room for doubt in their minds that if the defendant had received their cablegram of February 19th he was completely informed that they then proposed to contract on the basis of his original proposition. Their cablegram of March 1st was sent in order to ascertain whether he assented to their proposition as it then stood. On March 2d the defendant was informed that plaintiff's agents proposed to contract on the basis of his original proposition, because he had received their cablegram receding from the modifications they had proposed; and when he received the cablegram from plaintiff's agents of March 1st, asking him to cable them immediately the position of the contract, he was further informed that they were waiting for his acceptance of their final proposition. His cablegram of March 2d, in reply, was explicit and decisive. Both parties understood the situation then intelligently.

On March 5th, however, the defendant had received the letter of plaintiff's agents, mailed the same day with the sending of their cablegram, informing him of their withdrawal of the modifications they had proposed to his proposition. At this time he knew that both parties understood each other completely, and when he sent his letter of that date stating, in substance, that all doubts had been removed, and the details of the contract were correctly understood, he fully met and accepted the letter of plaintiff's agents of February 19th; and when in this letter he promised to forward the contracts as soon as he was provided with the credits, he referred to the bought note which he was to correct according to the contract, and sign and

send to the plaintiff's agents, and to the sold note which he was to send to them for their signature.

Undoubtedly the rule of law is that before an agreement can be gathered from a correspondence, it must appear by the correspondence that what has been proposed on the one side has been definitely agreed to upon the other, so that a clear and complete contract can be derived from the letters. Applying this rule, the contract was not made until the latest proposition on the part of the plaintiff was assented to by the defendant. The plaintiff's proposition was open until the defendant accepted it. It is not material to consider whether his cablegram of March 2d was an acceptance, because his letter of March 5th was clearly one the moment it was mailed. It has been urged for the defendant that the correspondence was but a negotiation for a contract, and that the parties contemplated the exchange of formal written instruments as a definite conclusion of their negotiation; and in this view of the case emphasis has been placed upon the facts that the defendant was acting as a broker; that plaintiff's agents knew this; and that both parties regarded the credit which was to be supplied in London as a condition precedent to a final contract. Although defendant was buying the rails to sell to another party, and although his profit was to be derived from a commission of 1 per cent. to be allowed him on the purchase money by the plaintiff, there is no room to doubt that both parties contemplated a contract in which he was to be a principal, and by which he was to pay cash for the rails upon delivery. They bought and sold notes sent by plaintiff's agents to defendant in their letter of February 5th, name the defendant as the purchaser, and conclude with the clause: "An approved bank credit to be arranged when this contract is confirmed." What was to be done to "confirm" the contract? Certainly nothing after the bought and sold notes were exchanged. But could either party recant at any time before the notes were exchanged? Did they intend the period of uncertainty to intervene which would take place while the notes were crossing the Atlantic? Certainly not; because in the same letter plaintiff's agents ask defendant to "cable confirmation of the contract." Confirmation of the contract was to be signified by a cablegram.

If confirmation was to be signified by a cablegram, the parties must have regarded the exchange of bought and sold notes, not as the preliminary to a contract, but as evidence of a contract already concluded. This view of the understanding of the parties is enforced by the statement in the plaintiff's letter that the notes are inclosed

"to avoid any possible mistake." Subsequent communications indicate that undoubtedly the plaintiff's agents were anxious to know whether the defendant's buyers had closed with the defendant, and provided him with the bank credit he was to forward to London; but the reasonable interpretation of the whole correspondence is that the parties intended to be reciprocally obligated when the conditions of the contract were fully understood and accepted by both.

Judgment is ordered for the plaintiff, with a reference to assess damages pursuant to the stipulation of the parties.