GALGATE SHIP CO., Limited, v. STARR & CO.

(District Court, N. D. California. November 27, 1893.)

No. 10,382.

1. SHIPPING—CHARTER PARTY—NEGOTIATION BY BROKERS—"BOUGHT AND SOLD NOTES."

Where the agents of a foreign ship, acting as brokers, negotiate an agreement, which, being communicated through their Liverpool house to the owner, results in the execution of a charter which is signed by the Liverpool house on behalf of the charterer, and thereupon the agents, to avoid complications from the necessary lapse of time before the charterer can inspect the instrument, notify him in writing of its terms, requesting confirmation, and at the same time send a similar notification to the owners, this is substantially a transaction by "bought and sold notes;" and where the charterer, by letter to the agent, confirms the terms stated, these two communications become complete evidence of the terms of the contract, and parol evidence is not admissible.

2. SAME—DUTY OF BROKERS.

If the agents, in their letter of notification, fail to particularly state a provision of the charter, which they have reason to believe will be objectionable to the charterer, merely including it in the expression "all other usual conditions," this, if a breach of duty at all, is a personal matter between them and the charterer, and does not relieve the latter from liability according to the legal construction of the letters of notification and confirmation.

8. SAME—CONSTRUCTION OF CONTRACT.

The expression "all other usual conditions" did not call for a provision in the charter for "charterer's surveyor," but was sufficiently fulfilled by a provision for "competent surveyor," qualified by a further provision that, if either party was dissatisfied with the survey, the matter should be submitted to two other regular port marine surveyors, with liberty to call in a third surveyor in case of disagreement.

In Admiralty. Libel in personam to recover damages for breach of charter party. Decree for libelant.

Page & Eells and Andros & Frank, for libelant.

Geo. W. Towle, Jr., and Joseph Hutchinson, for respondent.

MORROW, District Judge. In an opinion heretofore delivered in this case[1] I gave some weight to certain admissions contained in a letter written by Balfour, Guthrie & Co., of San Francisco, to Balfour, Williamson & Co., of Liverpool, and dated June 5, 1891. Portions of this letter, which referred to transactions not involved in this case, were properly omitted from the copy of the letter furnished the court; but one paragraph of this character was left in the letter by mistake, and, its irrelevancy being overlooked by the court, it was treated as containing an important admission against the libelant. This error being called to the attention of the court, a rehearing was granted, and the case reargued. In the light afforded by the review and the conclusions now reached a restatement of the case is necessary.

The action is to recover damages for the refusal of the respondent to fulfill the terms of a charter party alleged to have been entered

---

[1] Not reported.

into by it at Liverpool, England, about June 4, 1891, through its agents, Balfour, Williamson & Co., of Liverpool, with John Joyce & Co., agents of the owners of the ship Galgate. The answer of the respondent—

"Denies that on or about the 4th day of June, 1891, or ever, or at all, at Liverpool, England, or elsewhere, Messrs. John J yce & Co., as agents for the owner of the ship Galgate or otherwise, or at all, made and entered into, or made or entered into, an agreement of charter party, in writing or otherwise, with Starr & Company, respondents herein, by Balfour, Williamson & Co., of Liverpool, as agents and under authority of Starr & Company, or otherwise, or at all, for the charter of said ship Galgate; * * * denies that Balfour, Williamson & Co., of Liverpool, were the agents of respondent for the charter of the said ship Galgate, or otherwise, or at all, or that they had any authority whatever from respondent to enter into said charter, or any charter."

The libelant is a corporation organized under the laws of Great Britain and Ireland, having its principal place of business in Liverpool, and is the owner of the ship Galgate. The respondent, Starr & Co., is a corporation organized under the laws of the state of California, having its principal place of business in San Francisco. It is engaged extensively in the purchase, sale, and shipment of wheat and flour. As the name of the corporation indicates a partnership of individuals, rather than a single body, it is constantly referred to in the testimony in the plural number, as though it was such an association, and for convenience this form of expression will be followed hereafter in this opinion in referring to the respondent. Balfour, Williamson & Co. are Liverpool merchants, who include in their business the chartering of vessels for themselves and others. Balfour, Guthrie & Co. are San Francisco merchants, engaged in business of a like character, and are intimately related to the Liverpool house by a community of partnership interests.

The charter party introduced in evidence, and the subject of the present controversy, is largely a printed form of conditions, with special matter written in blank spaces left for the purpose. It is dated at Liverpool, June 4, 1891, and is signed by John Joyce & Co., managing owner of the Galgate, as the party of the first part, and "by authority of Starr & Company, Balfour, Williamson & Co., as agents," party of the second part. It provides for the chartering of the steel ship Galgate to Starr & Co. for a voyage from San Francisco to certain ports in Europe, at the option of the charterer, with a cargo of wheat or flour, or other lawful merchandise, and recites that the vessel was then on a voyage from New York to Melbourne, with liberty to take cargo from Newcastle to San Francisco for owner's benefit, and contains, among other conditions, the following:

"Vessel to be properly stowed and dunnaged; and certificate thereof and of good general condition, draft of water, and ventilation, to be furnished to charterers from competent surveyor."

As the form of this document was originally printed it provided that the certificate was to be furnished to the charterers from "charterers' surveyor," but the word "charterers'" had been erased by the pen, and the word "competent" interlined as a substitute for the word "charterers'." The negotiations relating to the charter

of the ship Galgate had their origin in the following cablegram, dated June 2, 1891, from Balfour, Williamson & Co., Liverpool, to Balfour, Guthrie & Co., San Francisco:

"Galgate: We offer for reply here, to-morrow, 14s., Newcastle, N. S. W., to San Francisco, 39 U. K., Havre, Antwerp, and Dunkirk, 44, Continent 1s. 3d., less direct, 28 February canceling, 1s. extra freight 31 January canceling."

For the purpose of placing this charter, Robert Bruce, of the firm of Balfour, Guthrie & Co., called upon Alfred Bannister, the vice president and manager of Starr & Co., and offered the ship Galgate for charter, on the terms indicated, for the voyage from San Francisco to Europe. There appears to have been more than one interview upon the subject between these two parties, but how many meetings were had is not clear from the testimony, nor is it material. The interviews were all had in the office of Mr. Bannister, and resulted in an offer from him on behalf of Starr & Co., which was communicated under date of June 2, 1891, by Balfour, Guthrie & Co., of San Francisco, to Balfour, Williamson & Co., of Liverpool, on the following terms:

"Galgate: We offer for reply here noon to-morrow, Starr & Company 38s. 9d., U. K., H., or A., Dunkirk, 5s. extra, continent 2s. 6d., less direct San Francisco, canceling 29 February, 1s. 3d. extra freight for one month's earlier arrival."

To this cablegram Balfour, Williamson & Co. replied as follows under date of June 3, 1891:

"Galgate declined. We might arrange with firm offer in hand 38s. 9d., U. K., H., A., D., 43s. 9d., continent 2s. 6d. off direct, 31 March canceling, 1s. 3d. extra freight for one month's earlier arrival."

This last offer was accepted by Starr & Co., and the acceptance was transmitted by cablegram under date of June 3, 1891, by Balfour, Guthrie & Co. to Balfour, Williamson & Co., in the following terms:

"Galgate: Starr & Co. willing to accept your last quotation. Exceptional offer. We recommend acceptance."

Balfour, Williamson & Co. replied June 4, 1891:

"Galgate: We have arranged 14 Newcastle to San Francisco 38—9, U. K., H., A., D., 43—9 continent 2s. 6d. off direct, 31 March canceling, 1s. 3d. more for one month's earlier arrival. We are arranging and signing here homeward charter for Starr & Co."

This appears to have been the first intimation that the charter party was to be signed in Liverpool. The testimony of Mr. Bannister, on behalf of respondent, on this point is as follows:

"Mr. Towle: Q. Mr. Bannister, did you, in advance, and prior to the 5th of June, 1891, authorize or advise Mr. Bruce that you would authorize their firm in Liverpool to sign this Galgate charter for account of Starr & Co. over there? A. No, sir, I never did. I did so with another ship a fortnight before, but not this one."

Mr. Bruce, for the libelant, being interrogated by the court upon this point, testified as follows:

"Q. Did you consult Mr. Bannister as to whether the condition incorporated in the cable of Balfour, Williamson & Co. to you, 'arranging and signing

homeward charter for Starr & Co.,' were satisfactory or not? A. Yes, sir. Q. That was not a matter that had been previously agreed upon? A. No, sir; it had never been discussed. Q. In your conversation with Mr. Bannister nothing was said as to where the charter should be signed? A. No, sir. Q. Was that cablegram the first notice that you had that the charter was to be signed on the other side? A. Yes, sir; that was the first indication. Q. The first intimation you had that that would be the way the agreement would be put into writing? A. Yes, sir. Q. Did you then go to Mr. Bannister, and inform him, or Starr & Co., that the charter would be signed on the other side? A. Yes, sir. Q. Did he make any objection to it? A. He did not. Q. What did he say to you about authorizing some one to sign for him or them? A. I don't know that he said anything special on the subject. If he had objected to it then, the charter would either have fallen through, or it would have been signed here by him. Q. Whom did he or they authorize to sign? A. He understood we were cabling to Balfour, Williamson & Co. Q. What I want to know is, was anything said about Balfour, Williamson & Co. signing the charter for Starr & Co. or for Mr. Bannister? A. I must have told him or shown him this cable that the charter would be signed on the other side. I probably said that the owner wished the charter signed on the other side, and naturally would require his approval of it. That approval was given the same day. Q. Did you call his attention to that part of the cable which says, 'We are arranging and signing homeward charter?' A. Yes, sir. Q. And Mr. Bannister agreed to the arranging and signing of the charter on the other side? A. In Liverpool."

There is nothing in the testimony indicating that Mr. Bannister or Starr & Co. had previously given authority to Balfour, Williamson & Co. to sign the charter party. It appears, however, that on June 4, 1891, Balfour, Guthrie & Co., in San Francisco, sent the following cablegram to Balfour, Williamson & Co., Liverpool:

"Galgate: Confirm charter to be signed on your side. Be particular. Usual terms. Charters' surveyor."

And on June 5, 1891, the charter party was signed in Liverpool by Balfour, Williamson & Co., who assumed to act by authority of Starr & Co. It is not claimed that this cablegram of June 4th was brought to the attention of Mr. Bannister, or that he was at the time made acquainted with its contents. But it seems probable that its implied authority to Balfour, Williamson & Co. to sign the charter party for Starr & Co. was the result of the interview between Mr. Bruce and Mr. Bannister; for it is difficult to understand how a business house of any standing would assume to represent another firm in such an important matter as the signing of a contract of this character, unless there was express authority for such action. But, however the fact may be, it appears that Starr & Co. made no objection to the charter party on the ground that it was signed without their authority.

The controversy that has arisen in this case had its origin in the provision of the document relating to the surveyor. The contention of Starr & Co. from the first has been that the agreement between Mr. Bannister and Mr. Bruce required that the charter party should provide for the employment of the "charterers' surveyor," instead of "competent surveyor," and that Balfour, Williamson & Co. acted in excess of their authority when, as the agents of Starr & Co., they agreed to the substitution of a "competent surveyor" for "charterers' surveyor." The authority of Balfour, Wil-

liamson & Co. to sign such a charter is therefore the real question in issue. The value of the provision contended for by Starr & Co. is explained by the fact that there are certain risks attending the stowage of a cargo of wheat or flour not covered by the ordinary insurance policy. If, for instance, any previous cargo has left any taint in the ship, the flour will absorb it, and thus become damaged. There is also a risk of loss and damage arising out of the stowage of certain goods and merchandise in contact with or in proximity to the flour. For the purpose of guarding against these and the like risks, Starr & Co. have a surveyor in their employ, whose duty it is to visit the ship as the cargo is being received on board, to see that the vessel is being properly lined and dunnaged, and go below into the hold of the ship, and personally supervise the stowage of the cargo. It is also his duty to see that all the ship's stanchions and parts composed of metal near the cargo are carefully wrapped in bags, gunnies, or other material to protect the flour from contact with rust. In short, he does whatever is necessary to reduce the sea damage to the cargo to the smallest possible amount. The marine surveyor, who represents the insurance companies, may be entirely competent for the services for which he is employed; but he is not required to render the special service secured by the charterer in the employment of his own surveyor. It has, therefore, become customary in the port of San Francisco for charterers to provide in the charter party that the certificate of the ship's condition shall be furnished by the charterers' surveyor, or they have it understood that he may be so employed. The blank form of charter party in general use in San Francisco had, however, in 1891, a blank space before the word "surveyor," into which could be written the name of the surveyor, or the word "charterers'," or, as it sometimes happened, the word "competent," as the parties might agree. This form of charter was adopted by Balfour, Williamson & Co. in Liverpool, and a short time prior to the transaction relating to the Galgate they had the word "charterers'" printed before the word "surveyor" in the form used by them. The Galgate charter is upon one of these forms, but, as before stated, the word "charterers," had been erased, and the word "competent" interlined above and before the word "surveyor." The testimony on the part of the libelant tends to show that the verbal agreement between Mr. Bannister and Mr. Bruce as to the conditions that were to be incorporated into the charter party had reference particularly to the rate of the charter, and that the clause relating to the surveyor was not a matter of discussion. In the course of the examination of Mr. Bruce, he was asked if he knew whether, in his negotiations with Starr & Co., the terms were expressed that "charterers' surveyor" should be incorporated into the charter party, to which he replied:

"I have no recollection of Mr. Bannister ever bringing the matter up. I am rather confirmed in my opinion from the fact that we sent on the original offer of Starr & Co. on the 2d of June, and there was not a single word in the cable conveying any such condition. If there had been any, it was our duty to have them sent forward."

The reason here given by Mr. Bruce for his belief that there was no understanding with respect to the surveyor clause is by no means conclusive, since the offer of June 2d appears to have been based upon the supposition that the charter party was to be signed in San Francisco, in which case, under the prevailing custom, the charter party would provide for the "charterers' surveyor." It was not until two days later that Starr & Co. learned that the charter party was to be signed in Liverpool, and then it was that Mr. Bannister claims to have had the understanding concerning this clause. His testimony upon this point is to the effect that after the agreement had been reached, on the 4th of June, as to the rate of charter, and, as Mr. Bruce was leaving the office, he said to Mr. Bruce: "Of course, this is as usual, with the usual understanding between your firm and us; this is on the San Francisco form of charter party, with all usual conditions and charterers' options;" to which Mr. Bruce replied: "Oh, yes; that is all right. It is always understood with you." Subsequently Mr. Bannister explained that "charterers' option" meant "charterers' surveyor," but in repeating this interview he varied his testimony, saying that he asked Mr. Bruce if the charter was to be drawn on the San Francisco form, giving the charterers the "usual conditions" and "charterers' surveyor," to which Mr. Bruce replied as above stated. There is manifestly some uncertainty about the exact terms of this interview, even in the mind of Mr. Bannister. We must therefore look elsewhere for further evidence on this point, since Mr. Bruce does not deny that there was such a conversation on June 4th. His belief that there was no understanding upon the subject has reference to the stage of the negotiations pending on June 2d. The cablegram of June 4, 1891, sent by Balfour, Guthrie & Co., at San Francisco, to Balfour, Williamson & Co., at Liverpool, contained the authority of the latter firm to sign for Starr & Co., and it is significant that, coupled with this authority to sign the charter party, is the express direction: "Be particular. Usual terms. Charterers' surveyor." Mr. Bruce was asked who originated this direction in the cablegram, and he somewhat evaded the question at first by saying that it would mean that there was to be no deviation in the conditions under which the ship should be loaded at this port, and that it should cover wheat, flour, and general merchandise; but, being again asked who originated the provision for "charterers' surveyor," he said that it was his impression that it originated with Balfour, Guthrie & Co., and not with Mr. Bannister; and it was "to try to get something to please Mr. Bannister, who would be extra well pleased that he was getting what you might call a straight charter." Being asked if he did not understand that Mr. Bannister generally desired the privilege of employing his own surveyor, Mr. Bruce replied: "All shippers in San Francisco appoint their own surveyors." In reply to questions he further explained the character of their business as follows:

"Q. Do you sometimes ask for conditions from your correspondents in Europe, which are not demanded or called for by the persons with whom you are dealing here? A. Sometimes, in case of charters to arrive. Q.

You ask for more favorable terms than the persons themselves apply for? A. Or might expect. Yes, sir. We have done so for one reason, and that is, we are also charterers of vessels, and engaged in the exporting business; and it is our interest as charterers to get as favorable conditions as we possibly can in chartering ships. For that reason we are naturally anxious to get the same conditions for other charterers,—favorable conditions for other charterers. Q. You think it to your advantage for other persons to have favorable conditions, as that would tend to give you the privilege of asking for the same? A. Yes, sir; I do."

The cablegram of June 4, 1891, from Balfour, Guthrie & Co. to Balfour, Williamson & Co., was therefore sent with the knowledge that in San Francisco charterers of vessels for cargoes of wheat or flour employ their own surveyor; that what is termed a "straight charter" would provide for such employment, and that Starr & Co. desired such a provision in the charter of the Galgate. But it is claimed that, while this is all true, Starr & Co. failed to incorporate this provision into the verbal agreement, and it was therefore not a part of the contract. The answer to this cablegram of June 4th is dated at Liverpool, June 5, 1891, and is as follows:

"Galgate: Charter signed here. Previously agreed competent surveyor. We cannot arrange otherwise."

In my previous opinion I commented on these last two cablegrams as indicating that there was a verbal agreement that the charter party should provide for "charterers' surveyor," and that the authority given by Starr & Co. to Balfour, Williamson & Co. to sign the charter party was coupled with this condition. These cablegrams do undoubtedly tend strongly in that direction, but in reviewing the testimony, and giving proper consideration to the established facts in the case, I am satisfied that the solution of the question in controversy must be determined by other evidence, and particularly by the construction to be placed upon the two following letters. The cablegram of June 5th, from Liverpool, was not communicated to Starr & Co., but Balfour, Guthrie & Co. wrote to them as follows:

"San Francisco, 5th June, 1891.

"Messrs. Starr & Co., San Francisco—Dear Sirs: We confirm having chartered to you Br. steel ship Galgate, 2,291 tons register, which sailed recently from New York for Sydney, on the following terms, viz.: To load as customary at this port, at 38/9 U. K., H., A., Dunkirk; 5/— extra other usual continent; 2/6 less direct; cancelling 31st March; 1/3 extra freight should vessel arrive on or before 29th February; 30 lay days; all other usual conditions; owners having the liberty of loading the vessel with coals at Newcastle, N. S. W., for this port for their benefit; and, in accordance with your authority, our Liverpool friends advise that they have signed the charter in Liverpool on your behalf, copies of which will be handed to you so soon as received from them. Please confirm the foregoing, and oblige,

"Yours, very truly,                    [Signed] Balfour, Guthrie & Co."

To which Starr & Co. replied as follows:

"San Francisco, June 5th, 1891.
"Galgate.

"Dear Sirs: We have your favor of this date advising charter to us of the above ship, and we hereby confirm said charter in terms of your letter.

"Yours, truly,  [Signed] A. Bannister, Vice President and Gen. Mgr."

It is contended on behalf of the libelant that these two letters constitute the contract of charter, and that, the contract being in writing, it cannot be changed in any of its terms by parol testimony; to which reply is made that the present action is not brought upon the letters, but upon the alleged charter party, and that the letter of Balfour, Guthrie & Co. refers to the charter party as having been signed, and points to it as the contract. The construction to be given to these two letters is the important question to be determined in this case. In my former opinion I did not concede to them the conclusive legal character insisted upon by libelant, and hence it is urged that I arrived at the erroneous conclusion that the charter party did not conform to the agreement of the parties. After a careful review of the transaction in all its legal aspects, I am satisfied that it should be considered as coming substantially within some of the rules established for the dealings of brokers who deliver "bought and sold notes" as the evidence of the terms agreed upon in the sale of merchandise. Balfour, Guthrie & Co. were the agents of the owners of the ship Galgate, acting in the capacity of brokers in disposing of the charter of the vessel. Their negotiations with Starr & Co. had resulted in an agreement which, being communicated through their Liverpool house to the owners of the vessel, had resulted in the execution of the charter party in Liverpool on behalf of Starr & Co. for the charter of the vessel on certain terms, usual in some particulars and special in others; but Starr & Co., being in San Francisco, had no opportunity to inspect the agreement at the time of its execution, and it would be some time before it would reach them in the course of the mail. There would therefore intervene a period of more or less uncertainty, during which time the binding character of this contract on the part of Starr & Co. would depend upon the question whether it had been executed within the terms of their authority. To avoid possible future complications on this account, and in the orderly course of a business transaction, Balfour, Guthrie & Co. notified Starr & Co., in writing, of the execution of the charter party in Liverpool, and, reciting its terms, requested that it should be confirmed. This was done promptly by Starr & Co., and without objection. This letter of notification may properly be termed the "bought note." On the same day, Balfour, Guthrie & Co. notified Balfour, Williamson & Co., in writing, of the charter to Starr & Co., reciting the same terms, but, as this last letter contained other statements, it will be referred to again in another connection; for the present it will be considered only as having performed the office of the "sold note."

Now, what was the effect of the letter to Starr & Co., and their reply confirming the terms of the contract? Iron Co. v. Foote, 16 Fed. 646–649, is a case much in point supporting libelant's contention that Starr & Co. became bound thereby to the terms stated in the letter of notification. In the case cited, Judge Wallace, speaking of an agreement deduced from correspondence between a seller and a broker, in which it appeared "bought and sold notes" had been exchanged, said:

"It has been urged for the defendant that the correspondence was but a negotiation for a contract, and that the parties contemplated the exchange

of formal written instruments as a definite conclusion of their negotiation; and in this view of the case emphasis has been placed upon the facts that the defendant was acting as a broker, that the plaintiff's agents knew this, and that both parties regarded the credit which was to be supplied in London as a condition precedent to a final contract. Although defendant was buying the rails to sell to another party, and although his profit was to be derived from a commission of one per cent., to be allowed him on the purchase money by the plaintiff, there is no room to doubt that both parties contemplated a ·contract in which he was to be a principal, and by which he was to pay cash for the rails upon delivery. The bought and sold notes sent by the plaintiff's agents to defendant in their letter of February 5th, named the defendant as the purchaser, and conclude with the clause, 'An approved bank credit to be arranged when this contract is confirmed.' What was to be done to 'confirm' the contract? Certainly nothing after the bought and sold notes were exchanged. But could either party recant at any time before the notes were exchanged? Did they intend the period of uncertainty to intervene which would take place while the notes were crossing the Atlantic? Certainly not, because in the same letter plaintiff's agents asked defendant to 'cable confirmation of the contract.' Confirmation of the contract was to be signified by a cablegram. If confirmation was to be signified by cablegram, the parties must have regarded the exchange of bought and sold notes; not as the preliminary to a contract, but as evidence of a contract already concluded."

In line with this authority are the following rules governing "bought and sold notes" as stated by Mr. Benjamin in his work on Sales, (section ·295:)

"The bought and sold notes do not constitute the contract, but, * * * when they correspond and state all the terms of the bargain, are complete and sufficient evidence to satisfy the statute, even though there be no entry in the broker's books, or, what is equivalent, only an unsigned entry."

If we apply these rules by analogy to the case at bar, we must determine that this action was properly brought on the charter party, and that the letter of notification sent by Balfour, Guthrie & Co. to Starr & Co. was complete and sufficient evidence of the terms of the contract, and, coupled with Starr & Co.'s letter of confirmation, amounted to evidence of such a conclusive character as to exclude parol testimony. But it is urged that Balfour, Guthrie & Co. did not in their letter to Starr & Co. communicate all the information they had concerning the terms of the charter party. Tᴜ̠ey had been advised that their efforts to secure the provision for "charterers' surveyor" had failed, and they suppressed this information. Now, it is contended on the part of the respondent that, whether this provision was a part of the verbal agreement or not, it was a provision desired by Starr & Co.; and, Balfour, Guthrie & Co. having undertaken, through their house in Liverpool, to act as the agents of Starr & Co. in signing the charter party, they were bound to disclose the fact that this provision had been rejected, and, failing to do so, Starr & Co. had the right to treat the contract as void on the ground of fraud. But to sustain this position it must appear that Balfour, Guthrie & Co. were under some legal obligation, binding them to make such disclosure. They were the agents of the owner of the vessel in the special character of brokers. "The broker is primarily the agent of the party who employs him, and he becomes the agent of the other party only when the bargain or contract is definitely settled as to its terms between the principals, and is then only the agent of the third party in making the memorandum of

sale." 2 Amer. & Eng. Enc. Law, 577. See, also, Coddington v. Goddard, 16 Gray, 441–445.

The agency which Balfour, Guthrie & Co. undertook through their Liverpool house for Starr & Co. was, therefore, special, and limited to the single act of the signing of the charter party; and the business relation thus established by them did not differ materially in a legal sense from that of a broker with his principal who delivers "bought and sold notes" as the evidence of a sale of merchandise. It follows that such an agency did not of itself impose on Balfour, Guthrie & Co. any obligation to disclose to Starr & Co. the information they had concerning the surveyor clause in the charter party. Moreover, the libelant was not a party to the suppression of any information upon the subject. As far as it was concerned, the whole transaction was thoroughly understood, and so confirmed by the respondent. If there were any dealings or relations between Balfour, Guthrie & Co. and Starr & Co. that might be said to fairly give rise to an obligation on the part of the former to make a disclosure to the latter, it was a personal matter between them, and in no way involved the rights of the libelant in the contract now under consideration. To hold otherwise would be to open transactions of this nature to frauds of the most dangerous character, and the court establishing such a doctrine would, to use the language of Lord Thurlow in a leading case, (Fox v. Mackreth, 1 White & T. Lead. Cas. Eq. 119,) "run the hazard of undoing all the common transactions of mankind, and of rendering all their dealings too insecure." From these considerations I have reached the conclusion that the letter of Balfour, Guthrie & Co. of June 5th, having been confirmed by Starr & Co., must be accepted as stating the terms of the contract entered into by the parties in San Francisco to the exclusion of parol testimony.

We come now to the construction of the terms of this letter. It will be observed that, after stating the charter rates to certain ports, canceling dates and lay days, the letter contains the following words: "All other usual conditions." The question arises as to the meaning of this phrase. Does it include the condition providing for "charterers' surveyor," or was it so understood by the parties in arranging the terms of this charter party? In the interview between Mr. Bannister and Mr. Bruce, which took place the day previous to the writing of these letters, Mr. Bannister himself makes a distinction between "usual conditions" and "charterers' surveyor." He testifies that he asked Mr. Bruce at the interview if the charter was to be on the San Francisco form giving them "usual conditions" and "charterers' surveyor," and, being questioned as to his custom in asking for the San Francisco form of charter, and his object in doing so, he replied: "Because I often add 'charterers' surveyor,' about which there might be some doubt." Mr. Bruce, in his testimony, makes the same distinction. He says, "The usual charter, I consider, has nothing whatever to do with the term 'surveyor,'" and he explains that the conditions of the San Francisco form of charter relate to the cargo of the vessel, the option of the charterer to order the vessel on a direct voyage at a reduction of 2s. 6d. per

ton, the privilege of moving the vessel to and from various loading points in the bays of San Francisco and San Pablo; and it also has a clause relating to strikes, etc. He is asked if the phrase "usual terms" does not cover "charterers' surveyor," and he replies that it does not. This testimony is uncontradicted, and establishes the fact that neither the San Francisco form of charter nor the phrase "all other usual conditions" called for "charterers' surveyor." It may be said, however, that neither would it call for "competent" surveyor, but would leave a blank space preceding the word "surveyor," to be filled up by a subsequent agreement. There would be some force in such a claim but for the qualifying provision in the charter party immediately following the word "surveyor." The provision is as follows:

"If the captain or charterers be dissatisfied with the certificate given, the matter in dispute shall at once be submitted to two other regular port marine surveyors,—one chosen by the captain, and one by the charterers,—who, if they cannot agree, may call upon a third surveyor. A majority decision and certificate shall determine the matter in dispute, and the cost of the said special survey shall be borne by the party against whom said decision may be rendered."

This provision certainly qualifies the designation of a "competent surveyor" as appropriately as it would "charterers' surveyor," and was evidently designed to protect the rights of both parties to the contract. In the absence of an agreement to the contrary, the insertion of "competent surveyor" was a fair condition, and such as the law would imply.

I am therefore of the opinion that the charter party conforms to the terms stated in the letter of Balfour, Guthrie & Co. of June 5th; that, these terms having been accepted and confirmed by Starr & Co., they are bound by the conditions of the charter party; and that this action is properly brought on the extended and formal contract. These conclusions properly dispose of this case, leaving only the question of damages to be determined; but before proceeding to the latter question it may not be entirely out of place to say that in my former opinion I reached the conclusion that there was a verbal agreement providing for "charterers' surveyor." This conclusion was based almost entirely upon parol testimony, and upon certain admissions contained in the letter by Balfour, Guthrie & Co. to Balfour, Williamson & Co., dated June 5, 1891, the same day of the letter to Starr & Co. This letter commences by reciting the terms of the charter as follows:

"We confirm having fixed to Messrs. Starr & Co. the * * * Galgate, 38s. 9d. U. K., H., A., Dunkirk; 5s. extra other usual continent; 2s. 6d. less direct; canceling 31st March; 1s. 3d. extra freight for one month's earlier arrival; 30 lay days; all other usual conditions."

The letter then proceeds with the following statement:

"Messrs. Starr & Co., we may mention, are not in favor of charters being signed on your side, as they distinctly prefer to use their own form of charter, which, however, in all respects is identical with that used by ourselves and other shippers. They are, however, perfectly definite in insisting that the ship shall employ their surveyor, and that no change whatever shall be made in the usual stevedore clause; and we cannot meantime state how they may

view your having agreed to a 'competent' instead of a 'charterers' surveyor in connection with the Galgate, although probably we may not have any difficulty regarding this. You must, however, bear in mind that when charterers consent to your signing charter on their behalf they do not expect that the conditions will be different in any way from those which would be granted to them here, and it is essential, when cabling offers of vessels, that you should distinctly advise us where the owners insist upon any alteration in the form of the usual charter. We consider from the position of the Galgate that she is exceptionally well fixed, and may state that the best proposal we had from any charterers was only 37s. 6d., canceling 31st January, there being evidently a distinct indisposition to charter vessels which are likely to arrive at this port after 31st Decr."

This letter contained, among other paragraphs, one referring to what was termed an "unfortunate mistake," but in another charter. This paragraph was inadvertently read and construed as referring to the Galgate charter, and treated as important in the conclusion reached that there was an express agreement that the charter should provide for charterers' surveyor. The portion of this letter referring to the Galgate charter is, however, open to a different construction. It states the objection of Starr & Co. to charters being signed on the other side, and that "they were perfectly definite in insisting that the ship shall employ their surveyor," but it is nowhere stated that there had been any agreement to that effect with Starr & Co.; yet, if there had been, it would have been natural and businesslike for Balfour, Guthrie & Co. to have so stated in this letter. The same may be said with respect to the letter of Starr & Co., dated June 22, 1891, acknowledging the receipt from Balfour, Guthrie & Co. of two charters, one being the charter of the Galgate. The letter states that both charters were in order, except that "we shall require the word 'charterers' before 'surveyor' in the Galgate charter, which has been struck out to stand as printed." If there had been an agreement between the parties to this effect, why did not Starr & Co. say so in this letter? If such had been the fact, it certainly would have been the most natural and convenient expression for the writer to have said: "Our agreement called for charterers' surveyor; we shall, therefore, require," etc. This letter concludes as follows:

"Will you oblige us with any information you possess as regards the means and standing of the owners of these two ships? We presume that your Liverpool firm are satisfied that the signatures of the owners of these ships are correct, and under proper authority.

"Yours, truly, [Signed] A. Bannister, Vice President and Manager."

In response to this letter, Mr. A. B. Williamson, a clerk in the house of Balfour, Guthrie & Co., called upon Mr. Bannister with respect to the matters contained in his letter. Mr. Williamson testifies that Mr. Bannister expressed disappointment that the word "charterers" had been deleted and the word "competent" inserted. Mr. Williamson explained to Mr. Bannister that the Liverpool house had tried to exclude the word "competent," but had been unable to do so. Mr. Bannister said he wanted his own surveyor employed. He was then informed by Mr. Williamson that Starr & Co. could not expect to have their wish carried out in this respect if they chartered vessels through other firms accepting the word

"competent." Mr. Bannister is represented as having denied the acceptance of such condition until a letter was produced containing evidence of that fact, when he explained that in the case referred to he had an understanding with the San Francisco agent of the vessel that he would have his own surveyor. Mr. Williamson claims to have then assured Mr. Bannister that, as Balfour, Guthrie & Co. would have control of the captain when the vessel arrived, they would be able to arrange it so that Mr. Bannister should have his own surveyor. The testimony of Mr. Bannister as to what passed at this interview is as follows:

"Mr. Williamson came down to our office to see me, and tried to get me to waive the objection I had raised, and to allow 'competent surveyor' to stand in the charter. I told him I was very sorry I could not do this, although I had no doubt, as he said, his firm would see that there was no trouble in loading the ship for us. But I said my bid to Mr. Bruce was based on the San Francisco shippers' form of charter, and especially I named to Mr. Bruce, when I bid on the ship, that 'charterers' surveyor' was to be in the charter party, and if he wanted us to load the ship he had to complete the charter in terms of my bid. He argued with me a little, and tried to get me to waive that; but I insisted on it, and told him we should not change. He then agreed to get the word 'charterers' inserted in the charter party, and to cable that night to his Liverpool firm to have it done."

On June 25, 1891, Balfour, Guthrie & Co. wrote to Starr & Co. as follows:

"We duly received your favor of the 22nd inst., and we have since explained to you verbally the reason our Liverpool friends were unable to get the word 'charters' surveyor' left in the charter party per Galgate. You may rest satisfied, however, that we will see that there is no trouble in this connection. You may be assured our Liverpool friends have satisfied themselves that the signatures under these charter parties are correct, and under proper authority."

To this letter there was no reply in writing. July 7, 1891, Balfour, Guthrie & Co. transmitted to Starr & Co., by letter, two additional copies of the charter of the Galgate. The receipt of the letter with its inclosures was on the same day acknowledged in the following terms:

"San Francisco, July 7th, 1891.

"Messrs. Balfour, Guthrie & Co., City—Dear Sirs: We have to acknowledge with thanks yours of even date, with stated inclosures.

"Yours, truly,                    [Signed] H. M. A. Miller, Secy."

It is somewhat significant that in no letter or cablegram that passed between any of the parties at the time of this transaction is it stated that there was any agreement as to the surveyor clause. This feature of the case, and the testimony concerning the correspondence and conduct of the parties subsequent to June 5th, are referred to for the purpose of indicating that, aside from the conclusive character of the written evidence, I do not now, upon a review of the testimony, find, as I did before, that there was a verbal agreement providing for charterers' surveyor.

The Galgate arrived in San Francisco January 30, 1892, and on February 1, 1892, Balfour, Guthrie & Co. notified Starr & Co. of her

arrival. The correspondence relating to the final refusal of Starr & Co. to carry out the charter party is as follows:

"San Francisco, 1st February, 1892.

"Galgate.

"Messrs. Starr & Co., San Francisco—Dear Sirs: We beg to advise you of the safe arrival of the above vessel in this port on 30th ulto. under charter to your goodselves outwards. We are, dear sirs,

"Yours, faithfully,          [Sig.] Balfour, Guthrie & Co.,

"Alex. B. Williamson,

"Agents."

To which Starr & Co. replied as follows:

"San Francisco, February 2nd, '92.

"Galgate.

"Messrs. Balfour, Guthrie & Co., City—Dear Sirs: We have your favor of the 1st inst., regarding above vessel, which, however, is not under charter to us.

"Yours, truly,   [Signed] A. Bannister, Vice President and Manager."

Balfour, Guthrie & Co. responded in the following terms:

"San Francisco, 8th February, '92.

"Galgate.

"Messrs. Starr & Co., San Francisco—Dear Sirs: We beg to acknowledge receipt of your favor dated 2nd inst., and we will be obliged by your kindly informing us on what grounds you now for the first time make the assertion that you are not the charterers of above vessel. In your letter to us, dated 22nd June, 1891, you informed us that the charter party was in order, except that you wanted the word 'charterers' before 'surveyor' to stand as printed, to which we replied on the same date, assuring you that we would see that there should be no trouble in this connection. Now that the ship has arrived here, this assurance we are prepared to make good, by agreeing, as we are authorized to do, that, as requested by you, the word 'charterers' before the word 'surveyor' may stand as originally printed in the charter party, and that the word 'competent' before the word 'surveyor' be expunged.

"Yours, faithfully,         [Signed] Balfour, Guthrie & Co.

"pp. Alex. B. Williamson."

To which Starr & Co. replied as follows:

"San Francisco, February 9th, 1892.

"Galgate.

"Messrs. Balfour, Guthrie & Co., City—Dear Sirs: Your favor of the 8th inst., relating to the above ship, is to hand. We have never been the charterers of this ship, and do not desire, as proposed in your said favor, to charter her now.

"Yours, truly,    [Signed] A. Bannister, Vice President & Manager."

From the foregoing it appears that on February 2, 1892, Starr & Co. refused to accept the vessel and load her in accordance with the terms of the charter party. On that day the rate of charter for the Galgate was 17s. 6d. for the voyage therein named. The measure of damages in this case is, therefore, the difference between 40s. per ton, the rate named in the charter party, and 17s. 6d. The difference is 22s. 6d. per ton. The carrying tonnage of the vessel was 3,508 tons. The rate of exchange was $4.86. The difference in American money would therefore amount to the sum or $19,180.

A decree will be entered in favor of the libelant for this amount, together with interest and costs.