### STARR & CO. v. GALGATE SHIP CO.

(Circuit Court of Appeals, Ninth Circuit. April 22, 1895.)

#### No. 179.

1. PRINCIPAL AND AGENT — NEGOTIATION OF CHARTER PARTY BY BROKERS — BOUGHT AND SOLD NOTES.

A firm of brokers in San Francisco, having correspondents in London, offered to defendants, who were exporters of wheat and flour in San Francisco, a British ship for charter. After some negotiations, in which defendants required, as was their custom (the same being well known to the brokers), that the charter should contain a provision for "charterers' surveyor," the brokers telegraphed their correspondents in Liverpool an acceptance of the terms offered. The Liverpool correspondents then arranged for signing the charter party there, and the same was executed in behalf of the ship owners, but in doing so their agent struck from the printed form the word "charterers'," and inserted "competent" before the word "surveyor." This was objected to by the correspondents of the San Francisco brokers, but, failing to get it changed, they nevertheless signed the charter party, styling themselves "agents for defendants." On receiving notice thereof, the San Francisco brokers addressed a letter to defendants, stating that the charter party had been signed, giving its provisions as to rate of freight, time of arrival, etc., but failing to state the action taken in regard to the surveyor, merely concluding their statement with the expression, "all other usual conditions"; and they asked defendants to confirm the charter. This defendants accordingly did, but without any knowledge of the change that had been made. No authority had previously been given to execute the charter in Liverpool. *Held*, that the confirmation, having been made without knowledge of a material provision, was inoperative, and that the letter of notification and the answer of confirmation could not be regarded as a transaction by bought and sold notes so as to constitute them the sole evidence of the contract. 58 Fed. 894, reversed.

2. SAME—RATIFICATION.

Copies of the charter party having been transmitted in due course of time to the San Francisco brokers, they inclosed the same to defendants, and the latter immediately replied, stating that the terms were right, except that they should insist upon "charterers' surveyor." Some negotiations were had for the purpose of inducing them to waive this provision, but·they never did so, and the brokers assured them that they would see that there was no trouble in that connection. On the arrival of the ship, the brokers notified defendants thereof, to which defendants replied that the ship wa~ not under charter to them. Rates of freight had declined in the meantime. *Held*, that there was nothing in the circumstances or in the conduct of defendants which operated as a ratification of the charter or a waiver of the condition, and that they were not liable for refusal to load the ship.

Appeal, from the District Court of the United States for the Northern District of California.

This was a libel in personam by the Galgate Ship Company against Starr & Co., a corporation, to recover damages for an alleged breach

of a charter party. The district court rendered a decree for libelant. 58 Fed. 894. Respondent appeals.

Joseph Hutchinson and George W. Towle, for appellant.

Page & Ells and Andros & Frank, for appellee.

Before McKENNA, Circuit Judge, and HANFORD and HAWLEY, District Judges.

HAWLEY, District Judge. This is a libel in personam, in admiralty, brought to recover damages alleged to have been sustained by appellee by reason of the refusal of appellant to fulfill the terms of a charter party alleged to have been entered into by it, through its agents, Balfour, Williamson & Co., of Liverpool, with John Joyce & Co., agents of the owner of the ship Galgate. Appellant denies the making of the agreement and also denies that Balfour, Williamson & Co. were its agents for the charter of the ship. The district court, after the trial and hearing of the case, entered an order dismissing the libel, with costs. It subsequently vacated this order, and granted a rehearing, and, after argument of counsel, it adjudged that the appellee herein was entitled to recover from appellant the sum of $19,180. Galgate Ship Co. v. Starr & Co., 58 Fed. 894.

Appellant is a California corporation, and is extensively engaged in the shipment of wheat and flour to foreign countries. Appellee is a foreign corporation, having its principal place of business in Liverpool, and is the owner of the ship Galgate. Balfour, Guthrie & Co. are San Francisco merchants, who include in their business the chartering of vessels for themselves and for other parties. Balfour, Williamson & Co. are Liverpool merchants engaged in like business. These respective houses or firms are intimately related to each other by a community of partnership interests. The charter party, for a breach of which this action is brought, is dated at Liverpool, June 4, 1891. It is signed by John Joyce & Co., managing owners of the Galgate, as the party of the first part, and "by authority of Starr & Co., Balfour, Williamson & Co. as agents," the party of the second part. It provides for the chartering of the steel ship Galgate to Starr & Co. for a voyage from San Francisco to certain ports in Europe, at the option of the charterer, with a cargo of wheat, flour, or other lawful merchandise, and recites the fact that the vessel was then on a voyage from New York to Melbourne, with liberty to take cargo from Newcastle to San Francisco for owners' benefit. It was filled out on a printed form which, among other things, contained the following printed condition: "Vessel to be properly stowed and dunnaged; and certificate thereof, and of good general condition, draft of water, and ventilation, to be furnished to the charterers from charterers' surveyor." When executed the word "charterers" in the last clause was erased, and the word "competent" interlined in lieu thereof, so that it read "competent surveyor," instead of "charterers' surveyor." The controverted question as to the agreement between the parties centralizes around these words "competent surveyor" and "charterers' surveyor," and, incidentally, as to the meaning of the words "usual terms"

or "usual conditions," as used in certain cables and letters hereinafter referred to.

The contention of appellant is that it never authorized the signing of the charter party except it contained the condition that the certificate referred to in the clause above quoted was to be furnished by "charterers' surveyor." This is denied by appellee. The oral testimony upon this point is conflicting. It therefore becomes necessary to closely examine all the facts and circumstances furnished by the documentary evidence on both sides, so that from all the evidence the truth may be ascertained. There is no controversy whatever as to the importance of the provision in the charter for charterers' surveyor. It is admitted that there are certain risks attending the stowage of a cargo of wheat or flour not covered by the ordinary insurance policy; if, for instance, the previous cargo has left any taint in the ship, the flour will absorb it, and thus become damaged. There is also a risk of loss and damage arising out of the stowage of certain goods or merchandise in contact with or in proximity to flour. For the purpose of guarding against these and other like risks, Starr & Co. have a surveyor in their employ, whose duty it is to visit the ship constantly as the cargo is being received on board, to see that the vessel is properly lined and dunnaged; to go below into the hold of the ship, and personally superintend the stowage of the cargo. It is also his duty to see that all the ship's stanchions, and parts composed of metal near the cargo, are carefully wrapped in bags, gunnies, or other material to protect flour from contact with rust; in short, he does whatever is necessary to reduce the sea damage to the cargo to the smallest possible amount. The marine surveyor who represents the insurance companies may be entirely competent for the services for which he is employed, but he is not required to render the special services secured by the charterer in the employment of his own surveyor. It has, therefore, been customary in the port of San Francisco for charterers to provide in the charter party that the certificate of the ship's condition shall be furnished by the charterers' surveyor, or they have it understood that he may be so employed. The first negotiations for the charter of the ship took place in San Francisco about June 1, 1891, when Robert Bruce, of the firm of Balfour, Guthrie & Co., offered the ship for charter to Alfred Bannister, vice president of appellant. On June 2, 1891, Balfour, Williamson & Co. cabled Balfour, Guthrie & Co.: "Galgate: We offer, for reply here to-morrow, 14s. Newcastle, N. S. W., to San Francisco, 39 U. K., Havre, Antwerp, and Dunkirk, 44 continent, 1s. 3d. less direct, 28 February canceling, 1s. extra freight 31 January canceling." Upon the receipt of the telegram, several interviews were had between Bruce and Bannister, which resulted in an offer by Mr. Bannister, on behalf of Starr & Co., to Bruce, which was communicated, June 2, by Balfour, Guthrie & Co. to Balfour, Williamson & Co. by cable, as follows: "Galgate: We offer, for reply here noon to-morrow, Starr & Co. 38s. 9d. U. K., H., or A., Dunkirk, 5s. extra freight for one month's earlier arrival." To this cablegram Balfour, Williamson & Co. replied, June 3, 1891: "Gal-

gate declined. We might arrange with firm offer in hand, 38s. 9d. U. K., H., A., D., 43s. 9d. continent, 2s. 6d. off direct, 31 March canceling, 1s. 3d. extra freight for one month earlier arrival." This offer was accepted by Starr & Co., and on the same day Balfour, Guthrie & Co. cabled Balfour, Williamson & Co.: "Galgate: Starr & Co. willing to accept your last quotation. Exceptional offer. We recommend acceptance." Balfour, Williamson & Co. replied June 4, 1891: "Galgate: We have arranged 14 Newcastle to San Francisco 38-9 U. K., H., A., D., 43-9 continent, 2s. 6d. off direct, 31 March canceling, 1s. 3d. more for one month's earlier arrival. We are arranging and signing here homeward charter for Starr & Co." What occurred in Liverpool in relation to the signing of the charter party is testified to by P. D. Toosey, as follows:

"There was no discussion between John Joyce & Co. and Balfour, Williamson & Co. direct, for they never met, but there was some discussion, through me as broker, as to the word 'competent' being inserted before 'surveyor,' instead of 'charterers'.' The charter party was first signed by John Joyce & Co., and at the time of signing it they inserted the word 'competent,' instead of 'charterers'.' I took the charter party over to Balfour, Williamson & Co., and Mr. Fortune objected to the alteration. I then said that Mr. Joyce might possibly agree to the words 'charterers' surveyor, provided competent,' and Mr. Fortune agreed to this, and the words were inserted. I then took the charter party back to John Joyce & Co., but Mr. Joyce refused to agree to the alteration I had suggested, and insisted on the word 'competent' alone being substituted for 'charterers'.' I then took the charter party back to Balfour, Williamson & Co., and Mr. Fortune reluctantly agreed to the alteration which Mr. Joyce required rather than let the charter fall through. Before Mr. Fortune agreed to this alteration I told him, in order to induce him to give way, that I knew Starr & Co. had agreed to the words 'competent surveyor' being inserted in the charter party of another vessel, the 'Speake,' only a short time previously. This discussion took place in Liverpool on the 4th and 5th of June, 1891."

The facts in relation to the "Speake" are that the ship, after being chartered with the words "competent surveyor," was rechartered to Starr & Co. with the verbal understanding that Starr & Co. should employ their own surveyor, which was done. In the interviews had between Bruce and Bannister prior to June 4th nothing had been said with reference to the place where the charter party of the Galgate should be signed. There is nothing in the record to show that any authority had previously been given by Starr & Co. to have the charter party signed in Liverpool. The previous cablegram that had been sent had no reference to the signing of the charter, and the cable last sent by Balfour, Williamson & Co. was the first information that the parties in San Francisco had that it would be signed in Liverpool. In reply to this cable, Balfour, Guthrie & Co., on June 4th, cabled Balfour, Williamson & Co.: "Galgate: Confirm charter to be signed on your side. Be particular. Usual terms. Charterers' surveyor." Mr. Bannister testifies that June 4 was the first day that Starr & Co. had any firm offer on the ship; that, after the offer was made, he authorized Bruce to cable to his friends that Starr & Co. would accept the offer, and that he then and there stated to him the terms and conditions upon which the charter party was to be signed. In answer to the question: "You say you told Mr. Bruce, as he stepped outside, it was to

be on the San Francisco form of charter, and certain other things?" he said:

"I intended to say that the charter was to be written on the San Francisco form of charter party, drawn by San Francisco shippers, a committee of which I was one, and Mr. Balfour was one, and Mr. McNear, and other ship-pers. It specified a great many conditions that we had all agreed on, uni-formly putting in the strike clause, as Mr. Bruce testified, and many other conditions that we all agreed we would adhere to. It had the stiffening clause, the surveyor's clause, the loading clause, places of loading, and every-thing distinctly specified., I stated to Mr. Bruce, just as he was quitting the office, it was understood, as usual, between our two firms, that this charter was to be drawn on that form, giving us the usual conditions and charterers' surveyor in the document. * * * To which he replied: 'Oh, yes; that is all right; that is always understood with you.' I had a general understanding with him before to that effect."

Mr. Bruce had previously denied that any such conversation oc-curred between him and Mr. Bannister. His testimony in chief, in the main, tended to support the contention of appellee that, while Starr & Co. were giving authority to an agent to execute a charter party in their behalf, they failed to instruct the agent in this im-portant particular as to charterers' surveyor, and that the agent voluntarily undertook to secure the condition, "charterers' surveyor," as a favor to Starr & Co., and for the further reason that such a condition in the charter was remotely beneficial to the agent. Mr. Bruce testified that he did not know who originated the provision for "charterers' surveyor" in this case, and that he did not remem-ber who sent the cablegram of June 4th. Upon his cross-examina-tion, he testified as follows:

"Q. Do you know anything about Starr & Co.'s negotiations with you at that time, as to whether the terms were expressed that 'charterers' surveyor' should be incorporated? A. I have no recollection of Mr. Bannister ever bringing the subject up. I am rather confirmed in my opinion from the fact that he sent on the original offer for Starr & Co. on the 2d day of June, and there was not a single word in that cable conveying any special conditions. If there had been any, it was our duty to have sent them forward. Q. Who inserted that requirement, 'Usual terms, charterers' surveyor'? A. That would mean that there was to be no deviation in the conditions under which the ship was to be loaded at this port, and that it should cover wheat, flour, and general merchandise. Q. And charterers' surveyor? A. If the charter came out containing charterers' surveyor, Mr. Bannister would be extra well pleased, probably, in having his own way. Q. What I want to find out is whether or not that particular provision of this cable originated from Balfour, Guthrie & Co. or originated from Mr. Bannister. A. My impression is that it originated from Balfour, Guthrie & Co., and not from Mr. Bannister. Q. They simply made it a gratuitous suggestion for them to make it charterers' surveyor? A. That is my impression from the fact that the cable sending the positive offer contained no provisions. Q. You say Mr. Bannister might be extra well pleased to have his own way, if the charter came out that way. Having his own way how? A. Mr. Bannister very often used to remark that ship owners were generally getting everything their own way, and that it was just as well for charterers occasionally to have a little their own way. I suppose when the charter came out containing those words, 'charterers' sur-veyor,' that Mr. Bannister might be extra well pleased that he was getting what you might call a straight charter. Q. That is, one satisfactory to him-self; the usual charter in this case? A. The usual charter, I consider, has nothing whatever to do with the term 'surveyor.' * * * Q. Do you wish to be understood as saying that that cablegram was sent with that express cau-tion with reference to 'charterers' surveyor' without any understanding be-tween Balfour, Guthrie & Co. and Starr & Co. with reference to it? A. Yes;

that is my impression at this existence of time. Q. From what did Balfour, Guthrie & Co. get the information that Starr & Co. desired such a stipulation? A. I do not know that they ever got the information at all until the receipt of the charter parties. * * * The Court: Q. Now, then, 'charterers' surveyor,' —how did you happen to insert that in this cable? A. I have no recollection of Mr. Bannister ever referring to the charterers' surveyor in connection with that vessel. Probably the reason that that was put in was simply because Mr. Bannister was always glad when he got a little more than he expected. If the charter came out containing the words 'charterers' surveyor,' he probably would be extra well pleased. That is the only conclusion I can come to. Q. Do you think you had any conversation with him about it? A. I really do not recollect whether I had any conversation or not on that subject. Q. Can you say whether you had any conversation about the usual terms? A. It is possible he may have spoken about the usual terms; it is quite likely he did. Q. You are of opinion that you conferred with him as to the charter being signed on the other side? A. I am positive of that. Q. You had his agreement to that? A. It could not have been signed there without his consent. Q. With respect to the other portion of the cable, you do not know whether you consulted him or not? A. I do not recollect."

It will readily be observed that the testimony given by this witness upon his cross-examination materially qualifies the denial of the conversation testified to by Mr. Bannister about having the provision for charterers' surveyor inserted in the charter. Bruce admits that there was a conversation about inserting the "usual terms," but says that that had no reference to the surveyor clause. He does not remember who originated the condition in the cable as to "charterers' surveyor," but thinks it must have been Balfour, Guthrie & Co., and that they put it in so as to please Mr. Bannister by getting Starr & Co. a straight charter. When witnesses disagree, courts must look at the conditions and surroundings of the respective parties; the probabilities or improbabilities of their respective statements; their interest, if any, in the result of the litigation; their manner of answering questions. Their memories must be tested; their credibility established by satisfactory evidence. The presumption is that witnesses tell the truth. Courts usually hesitate to disregard the testimony of any witness unless he has been impeached or his credibility successfully established. They seek to determine the weight of evidence by other means. The wholesale and gratuitous assaults upon the character of a witness, too often indulged in by counsel, are not looked upon with favor, and are never given any weight unless it is clearly shown that the witness is unworthy of belief. Ordinarily, abuse of a witness does not reach the dignity of an argument. It is always better, where discrepancies exist, to search for the truth from the surrounding circumstances,—the reasonableness of the testimony; whether the acts alleged to have taken place did occur, or whether a conversation upon the particular subject was naturally liable to take place. These, and other considerations of like character, which readily suggest themselves to the mind, are the safest guides to enable the court to determine where the weight of testimony is to be found. In this case the witnesses seem to be of even credit; their interests are equal; their character and standing alike. Both are entitled to respectful consideration. The contradictions and discrepancies of each upon other points con-

tained in the record, which have been severely criticised by respective counsel, are about evenly divided.

We therefore turn our attention to other facts. The condition of "charterers' surveyor" in the charter is of especial importance to the charterers of the ship. This is conceded by both parties. It was, therefore, natural that such a condition would be insisted upon by Starr & Co. The previous interviews had been with reference to other conditions and other terms,—as to the price of freight, time of loading the ship, and where the cargo was to be taken, etc. There had been nothing said as to where the charter was to be signed. No authority had been given for the signing of the charter. When the cable came from Balfour, Williamson & Co. that they were arranging for the signing of the charter at Liverpool, it would be unreasonable to believe that the charterers would authorize the signing of the charter without some understanding and direction as to the usual terms and the insertion of the condition "charterers' surveyor." It would be unbusinesslike for merchants or shippers to overlook this important provision. The testimony of Mr. Bannister is in accord with business methods of business men engaged in such business transactions. There is nothing unreasonable about it. Mr. Bruce, in his testimony, recognizes the importance and reasonableness of such a proposition. He gives as a reason for believing that Mr. Bannister had not previously referred to the terms "charterers' surveyor" the fact that the original offer for the ship, on the 2d day of June, was cabled without a "single word in that cable conveying any special conditions," and immediately adds that, "if there had been any, it was our duty to have sent them forward." Here is a special recognition of the duty of Balfour, Guthrie & Co. to be loyal to their agents, a principle that is well established in the law. Mechem, Ag. § 454. If the reason thus given by Mr. Bruce is sound, and it certainly is, it logically follows that the cable of June 4 must have been inspired by Mr. Bannister, for this cable does contain the special conditions that Mr. Bannister testifies he gave to Mr. Bruce, and it was the duty of Balfour, Guthrie & Co. to embody the conditions in the cable. Moreover, it is perfectly clear from the evidence that the cable of June 4 was sent by Balfour, Guthrie & Co. with full knowledge that charterers of vessels for cargoes of wheat or flour always desired to appoint their own surveyors, and especially was this true of Starr & Co. This Mr. Bruce admits to be true, and by his own reasoning it was the duty of his firm to insist upon such terms being provided for in the charter, and, in this connection, it must be borne in mind that there is no evidence that Starr & Co. had at any time authorized its agent to sign the charter upon any other condition. The subsequent acts of the parties show still more clearly that Starr & Co. never consented to the signing of the charter without "charterers' surveyor" was specified therein. On June 5, Balfour, Williamson & Co., in answer to the cable of June 4, sent by Balfour, Guthrie & Co., replied, "Galgate: Charter signed here. Previously agreed 'competent surveyor.' We cannot arrange otherwise." Is it not evident, without further discus-

sion, that Balfour, Williamson & Co. exceeded their authority in agreeing to such terms and in signing the charter for Starr & Co.? The only authority ever given by Starr & Co., under any reasonable view that can be taken of this case from the evidence, was that contained in the cable sent by Balfour, Guthrie & Co. on June 4th. Up to that time there had been no authority to have the charter party signed in Liverpool. Bruce testified positively that the charter could not have been signed in Liverpool without Starr & Co.'s consent. They never consented except upon condition that "charterers' surveyor" should be inserted. There never was any valid contract agreed to between the parties which authorized the use of the terms "competent surveyor." If there is any clause in the charter party "in regard to which the minds of the parties have not met, the entire instrument is a nullity as to all its clauses." Compania Bilbaina de Navegacion, de Bilbao v. Spanish-American Light & Power Co., 146 U. S. 483, 497, 13 Sup. Ct. 142; Eliason v. Henshaw, 4 Wheat. 225; Insurance Co. v. Young, 23 Wall. 86; Minneapolis & St. L. Ry. Co. v. Columbus Rolling-Mill Co., 119 U. S. 151, 7 Sup. Ct. 168; Stove Co. v. Holbrook, 101 N. Y. 48, 4 N. E. 4. On the 5th of June Balfour, Guthrie & Co. addressed to Starr & Co. a letter, as follows:

"San Francisco, 5th June, 1891.

"Messrs. Starr & Co., San Francisco—Dear Sirs: We confirm having chartered to you the Br. steel ship 'Galgate.' 2,291 tons register, which sailed recently from New York for Sydney, on the following terms, viz.: To load as customary at this port at 38/9 U. K., H., A., Dunkirk, 5/– extra other usual continent, 2/6 less direct; canceling 31st March, 1/3 extra freight should vessel arrive on or before 29th Febr'y, 30 lay days; all other usual conditions; owners having the liberty of loading the vessel with coals at Newcastle, N. S. W., for this port, for their benefit; and, in accordance with your authority, our Liverpool friends advise that they have signed the charter in Liverpool on your behalf, copies of which will be handed to you as soon as received from them. Please confirm the foregoing and oblige. * * *"

—To which Starr & Co. replied:

"San Francisco, June 5, 1891.

"Galgate.

"Dear Sirs: We have your favor of this date advising charter to us of the above ship, and we hereby confirm said charter in terms of your letter. * * *"

The contention of appellee is that these letters constitute the contract; that, the contract being in writing, its terms cannot be changed by parol evidence. It is, among other things, argued by appellee in support of this contention that the principles announced in the cases of bought and sold notes should be applied to this case, and, in this connection, several authorities are cited tending to show that Balfour, Guthrie & Co. were not under any obligation to disclose to Starr & Co. the information they possessed concerning the surveyor clause in the charter party, and that the letter of Balfour, Guthrie & Co. of June 5th was confirmed by Starr & Co., and hence these two letters of that date must be accepted as stating the terms of the contract entered into by the parties. The authorities cited relate to cases where the business was conducted by a broker who acted for both parties, and in such cases the entry in the broker's books is held to constitute the contract, and to be such a written contract as

v.68F.no.1—16

will take the case out of the statute of frauds, which requires the contract to be in writing. Lord Ellenborough, in Heyman v. Neale, 2 Camp. 337, said:

"After the broker has entered the contract in his book, I am of opinion that neither party can recede from it. The bought and sold note is not sent on approbation, nor does it constitute the contract. The entry made and signed by the broker, who is the agent of both parties, is alone the binding contract. What is called the bought and sold note is only a copy of the other, which would be valid and binding, although no bought or sold note was ever sent to the vendor or purchaser. The defendant is equally liable in this case as if he had signed the entry in the broker's book with his own hand."

This rule necessarily implies that the principal, from the very nature of the transaction, must have had full knowledge of all the facts. If it be affirmatively established by parol evidence that the broker, in any given case, exceeded his authority, then the principal would not be bound by any entry made by the broker. The rule contended for is based on the presumption of knowledge on the part of the principal of all the essential facts, and this principle is recognized in all the authorities in relation to bought and sold notes, where the question is presented and discussed. Thus, in 1 Benj. Sales, § 296, it is said that "the bought and sold notes, when they correspond and state all the terms of the bargain, are complete and sufficient evidence to satisfy the statute." Goom v. Aflalo, 6 Barn. & C. 117; Sivewright v. Archibald, 20 Law J. Q. B. 529. But it may be shown that the broker had no authority from his employer to make the bargain which he has entered in his book. 1 Benj. Sales, p. 315, note 13; Peltier v. Collins, 3 Wend. 465. If the entry in the broker's books varies upon any material point from the contract concluded and agreed upon between the parties, the entry is not binding. Davis v. Shields, 26 Wend. 341; Pitts v. Beckett, 13 Mees. & W. 743; Goodman v. Griffiths, 1 Hurl. & N. 577; Sumner v. Stewart, 69 Pa. St. 321. In Benjamin on Sales (section 209) the author says:

"Parol evidence is always admissible to show that the writing which purports to be a note or memorandum of the bargain is not a record of any antecedent parol contract at all; * * * on the same principle, parol evidence is admissible for the purpose of showing that the written paper is not a note or memorandum of the antecedent parol agreement, but only of part of it, and the decisions are quite in accordance with this view. Thus, if the writing offered in evidence contains no reference to the price at which the goods were sold, parol evidence is admissible to prove that a price was actually fixed, and that the writing is thus shown not to be a note of the agreement, but only of some of its terms. So where a sale of wool was made by sample, and one of the terms of the bargain was that the wool should be in good dry condition, parol evidence was admitted to show this fact, and thus to invalidate the sold note signed by the broker, which omitted that stipulation."

In order to exclude oral evidence of a contract, it must first be settled that there is a subsisting written contract between the parties, and, where the immediate issue is whether the writing was signed by authority covering the contract, it is not competent to exclude oral testimony bearing on that issue upon an assumption of such writing. "To do so is to beg the question." Manufacturing Co. v. Maclister, 40 Mich. 84. Where a broker acts merely to bring the parties together, after which the parties negotiate with each other

directly, and the broker makes an entry of the sale in his book, such entry will not bind either party, nor will it prevent either party from giving parol evidence of the contract. Aguirre v. Allen, 10 Barb. 74. The contention of appellee cannot be sustained. Balfour, Williamson & Co. were not the agents of both parties. The contract here sued upon is contained in the charter party.

The real question to be decided is whether it was ever executed by the authority of Starr & Co. If it was, then appellee is entitled to recover. If it was not, then appellant is entitled to have the libel dismissed, unless it subsequently, with full knowledge of all the facts, confirmed or ratified the contract. To determine the question of authority, it becomes necessary to consider, as we have already done, all the facts and circumstances prior to and at the time of the signing of the charter, whether such facts are found in written instruments or by parol evidence. There is no dispute as to the terms or conditions expressed in the charter party. They are clear, plain, and unambiguous. No parol evidence was offered to change or vary any of its terms. Having arrived at the conclusion that appellant never authorized Balfour, Williamson & Co. to execute the charter in its behalf unless it contained the provision for charterers' surveyor, the only other question to be determined is whether it, with full knowledge of all the facts, has confirmed or ratified the same, or waived the condition of charterers' surveyor. The cable from Balfour, Williamson & Co. of June 5th, that they had previously agreed to "competent surveyor," was never shown to appellant. It had no knowledge of that fact. The letter of Balfour, Guthrie & Co. of June 5th did not inform appellant of the fact that the charter was executed with the clause "competent surveyor." It had the right, therefore, to assume that its demand in this respect had been inserted in the charter party. Unless it had full knowledge of what had been done, its letter in reply did not constitute a confirmation of the contract. It was the duty of Balfour, Guthrie & Co. in the letter of June 5th to have informed appellant of the facts set forth in the cable that day received by them from Balfour, Williamson & Co. Mechem, Ag. § 538; Devall v. Burbridge, 4 Watts & S. 305; The Distilled Spirits, 11 Wall. 356, 367. When an agent departs from instructions. and does not inform his principal of the fact of his departure, the principal cannot be supposed to confirm or ratify. Bell v. Cunningham, 3 Pet. 69. The general rule is well settled that a confirmation or ratification of the unauthorized acts of an agent, in order to be effectual and binding on the principal, must have been made with a full knowledge of all material facts. and that ignorance, mistake, or misapprehension of any of the essential circumstances relating to the particular transaction alleged to have been ratified will absolve the principal from all liability by reason of any supposed adoption of or assent to the previously unauthorized acts of an agent. Combs v. Scott, 12 Allen, 496; Clarke v. Lyon Co., 7 Nev. 75; Reese v. Medlock, 27 Tex. 121; Bannon v. Warfield, 42 Md. 22; Barnard v. Wheeler, 24 Me. 412; Bennecke v. Insurance Co., 105 U. S. 355; Owings v. Hull, 9 Pet. 607, 629. A waiver, to be available, must be clearly and explicitly

shown.. There must be knowledge of all the facts. A waiver of a condition in a contract never occurs unless intended by the party, or where the act relied upon ought in equity to estop the party from denying it. Diehl v. Insurance Co., 58 Pa. St. 443; Bennecke v. Insurance Co., 105 U. S. 359.

It is argued by appellant that the words "usual terms" and "usual conditions," as mentioned in the telegrams and letters, meant San Francisco form of charter and charterers' surveyor. This is denied by appellee. It is unnecessary to decide this question. So far as the letters of June 5th are concerned, it is wholly immaterial what construction should be given to these words. If, as appellant contends, the term "usual conditions" includes charterers' surveyor, then it would be considered from the letters of Balfour, Guthrie & Co. that the condition for charterers' surveyor had been complied with, and Starr & Co's. confirmation would be in accordance with that understanding. If the term "usual conditions" did not include charterers' surveyor, then Balfour, Guthrie & Co. failed and neglected to inform Starr & Co. of the fact that "competent surveyor" had been inserted in the charter, as it was their duty to do, and Starr & Co. cannot be held to have confirmed the charter party with that provision, because they had never authorized its execution without the condition, "charterers' surveyor." Balfour, Guthrie & Co. must have known that Starr & Co. would not desire to confirm the charter unless charterers' surveyor was provided for therein. On the 5th of June, 1891, the same day of the letter to Starr & Co., Balfour, Guthrie & Co. addressed a letter to Balfour, Williamson & Co. which, among other things, contained the following:

"We confirm having fixed to Messrs. Starr & Co. the Galgate. * * * Messrs. Starr & Co., we may mention, are not in favor of charters being signed on your side, as they distinctly prefer to use their own form of charter, which, however, in all respects is identical with that used by ourselves and other shippers. They are, however, perfectly definite in insisting that the ship shall employ their surveyor, and that no change whatever shall be made in the usual stevedore clause, and we cannot in the meantime state how they may view your having agreed to a 'competent' instead of 'charterers'' surveyor in connection with the Galgate, although probably we may not have any difficulty regarding this. You must, however, bear in mind that, when charterers consent to your signing charter on their behalf, they do not expect that the conditions will be different in any way from those which would be granted to them here, and it is essential in cabling offers of vessels that you should distinctly advise us when the owners insist on any alteration in the form of the usual charter. * * * Please send us six copies of each of the charters of these two vessels, so that we may hand them over to Starr & Co."

Leaving out of consideration the general remarks relating to the signing of all charters, and confining the construction of the letter to that portion which refers distinctly to the Galgate, it plainly indicates, in clear and unmistakable language, that Starr & Co. had never given any authority to have the charter signed without the proviso, "charterers' surveyor." They were unable to say how Starr & Co. would view the matter of having a "competent" instead of "charterers'" surveyor, but thought it probable there might be "no difficulty regarding this." On the 22d of June, 1891, after the re-

ceipt of the charters referred to in the foregoing letter, Balfour, Guthrie & Co. addressed the following letter to Starr & Co.:

"Dear Sirs: We now have pleasure in handing you copy of charter party effected through our Liverpool friends on your account per Avanta Savoia, and also per Galgate, all the terms of which we trust you will find in order. Kindly acknowledge and oblige. * * *"

—To which, on the same day, Starr & Co. replied as follows:

"Yours of the 22d inst. to hand, inclosing charter parties of the Galgate and the Avanta Savoia, which are in order, except that we shall require the word 'charterers' ' before 'surveyor' in the Galgate charter, which has been struck out, to stand as printed. Will you oblige us with any information you possess as regards the means and standing of the owners of these two ships? We presume your Liverpool firm are satisfied that the signatures of the owners of these ships are correct and under proper authority. * * *"

Here is a direct statement that Starr & Co. required the correction of the charter so as to read "charterers' surveyor." This letter shows that Starr & Co. did not repudiate the clause "competent surveyor" until the price of freight for the charter of the ship had declined, as claimed by appellee. Mr. Bruce testified upon this point as follows:

"The freights in this market remained strong for some time after the 4th day of June. The freight market remained strong, both for ships on the spot and ships to arrive. Q. About how long did that continue? A. That continued for a few months. Q. What was it that upset the freight market here, if anything? * * * A. The freight market was practically demoralized or upset by the default of Dresbach and Lowenthal, Livingstone & Co. to load their ships. * * * Q. After that time there was a drop in freights? A. A complete and steady decline. Q. Up to the time of the arrival of the Galgate (January 30, 1892)? A. Yes, sir."

On the 25th of June, 1891, three days after the letter of Starr & Co. had been received, the following letter was written by Balfour, Guthrie & Co. to Starr & Co.:

"We duly received your favor of the 22d inst., and we have since explained to you verbally the reason our Liverpool friends were unable to get the words 'charterers' surveyor' left in the charter party for Galgate. You may rest satisfied, however, that we will see that there is no trouble in this connection. You may be sure our Liverpool friends have satisfied themselves that the signatures under these charter parties are correct, and under proper authority."

The interviews referred to in this letter occurred between Mr. Williamson, a clerk for Balfour, Guthrie & Co., and Mr. Bannister. Mr. Williamson testifies that he endeavored to convince Bannister that Starr & Co. ought to accept the charter of the Galgate with the words "competent surveyor," because they had accepted other charters with a like provision, and that Bannister did not at that time repudiate the charter. Mr. Bannister testifies that he informed Mr. Williamson that the word "charterers' " with reference to the surveyor must be inserted if they wished Starr & Co. to load that ship. Mr. Williamson testifies as follows:

"My interview was with Mr. Bannister, and I referred to the letter which we had received, and Mr. Bannister expressed disappointment that our Liverpool firm had allowed the word 'charterers' ' to be deleted, and 'competent' inserted. I told him that our Liverpool firm had tried to exclude the word 'competent,' but we had been advised by them that they had been unable to do so. He said that he should want his own surveyor to be employed, and I said he

could not expect our firm to carry out his wishes in that respect if he chartered vessels through other firms here, accepting the word 'competent'."

## Mr. Bannister's version of this interview is given as follows:

"Mr. Williamson came down to our office, and saw me, and tried to get me to waive the objection I had raised, and to allow 'competent surveyor' to stand in the charter. I told him I was very sorry I could not do this, although I had no doubt, as he said, his firm would see there was no trouble in loading the ship for us; but I said my bid to Mr. Bruce was based on the San Francisco shippers' form of charter and especially I named to Mr. Bruce when I bid him on the ship that 'charterers' surveyor' was to be in the charter party, and, if he wanted us to load the ship, he had to complete the charter in the terms of my bid. He argued with me a little, and tried to get me to waive that, but I insisted on it, and told him we should not change. He then agreed to get the word 'charterers' ' inserted in the charter party, and to cable that night to his Liverpool firm to have it done."

Other interviews were had. It is unnecessary to refer to them. Mr. Williamson wrote the letter of June 25th, and says it was intended to supplement his understanding with Bannister. The letter speaks for itself. It contains a promise on the part of Balfour, Guthrie & Co. that they will see that there is no trouble about the surveyor. Mr. Bruce, in his testimony, states that Balfour, Guthrie & Co. "sent no cables to Liverpool regarding the ship Galgate, after the 5th of June, until the 30th of January, 1892," and that "none were received from them." On the 1st day of February, 1892, the following letter was sent to Starr & Co.:

"Galgate.

"Messrs. Starr & Co., San Francisco—Dear Sirs: We beg to advise you of the safe arrival of the above vessel in this port on the 30th ult., under charter to your good selves outwards. We are. dear sirs,

"Yours, faithfully,                 Balfour, Guthrie & Co.,
                                       "Alex. B. Williamson, Agents."

—To which Starr & Co. replied, on February 2d, as follows:

"Galgate.

"Messrs Balfour, Guthrie & Co., San Francisco—Dear Sirs: We have your favor of the 1st inst. regarding above vessel, which, however, is not under charter to us.

"Yours, truly,                 A. Bannister, Vice President and Manager."

What occurred after this has no special bearing on the questions involved in this case. It is deemed proper to state that Balfour, Guthrie & Co. immediately cabled to Liverpool, and tried to get the provision in the charter changed, and that the owners of the ship declined to make any alteration in the clause "competent surveyor."

After a careful investigation of all the evidence, our conclusions are: (1) That Starr & Co. never authorized the signing of the charter party, except upon the condition that charterers' surveyor was provided for therein; (2) that Starr & Co. never confirmed or ratified the signing of the charter with the clause "competent surveyor" at any time after full knowledge of that fact had been communicated; and (3) that Starr & Co. never at any time waived the condition as to charterers' surveyor. The libel should have been dismissed.

The judgment of the district court is reversed, with costs in favor of appellant.