## ADLER v. GALBRAITH, BACON & CO.

### (District Court, W. D. Washington. September 7, 1907.)

### No. 2,785.

**1. ADMIRALTY—JURISDICTION—MARITIME CONTRACT.**

While a suit to collect brokerage and money expended in negotiating a charter party is not a case of admiralty and maritime jurisdiction, nor cognizable in a court of admiralty, a libel which alleges that libelant as agent for respondent, executed a charter party in his own name, by which respondent became obligated as his principal, and that by reason of respondent's breach of the contract libelant was compelled, as the nominal party, to pay damages which he seeks to recover by subrogation to the rights of the other party, is one founded on the charter party and within the admiralty jurisdiction.

[Ed. Note.—Jurisdiction as to matters of contract, see notes to Norton v. The Richard Winslow, 18 C. C. A. 347; Bontin v. Rudd, 27 C. C. A. 530.]

**2. SHIPPING—CHARTER PARTY—AUTHORITY OF AGENT TO BIND PRINCIPAL.**

The rule which casts upon the charterer the risk of unavoidable delay of a ship in reaching her loading port has a reasonable limitation, and a charterer is not obligated to accept the ship if by excessive delay the object he had in view has been frustrated, and he has been deprived of all beneficial use of her. Therefore a charterer is not bound by a charter in which his agent without his authority fixed an absolute date until which the vessel might be delivered.

**3. SAME.**

Libelant, as a subagent, in December chartered for respondent a vessel to carry a cargo from Hamburg, Germany, to Seattle, and also as such agent or broker purchased the cargo in Hamburg. The negotiations were conducted in Seattle between respondent and the German consul at Vancouver, B. C., who was connected with libelant in the brokerage business at Hamburg. It was understood that early sailing was important and should be in January or February, if possible; but respondent authorized the charter of the vessel, which it was advised was "expected to load in March," and it was also contemplated that the usual Hamburg-Californian charter party should be used. Without respondent's knowledge, libelant agreed to a clause in the charter party giving the owners until May 31st to deliver the vessel, and on receiving a copy respondent at once rejected it and so notified the other party to the negotiations and refused to accept the vessel. *Held,* that respondent's contract was governed by the laws of this country, where it was made, and under which respondent was not bound to accept the charter, and especially where the claim for damages for breach of the contract was made by libelant as having been subrogated to the rights of the vessel owner; his own negligence or want of good faith toward his principal having been the sole cause of his loss.

In Admiralty. Suit in personam to recover damages from the charterer of a ship for refusal to accept the vessel, or to pay the amount demanded for canceling the charter party. Hearing on the merits. Decree for respondent.

Kerr & McCord, for libelant.

Roberts & Leehey and J. M. Ashton, for respondent.

HANFORD, District Judge. The following is a condensation of the charging part of the libel: In the month of December, 1903, the respondent (a corporation) purchased a ship load of cement and salt to be shipped from Hamburg to Seattle. The purchase was consummated through brokers; the libelant at Hamburg and his correspondent, Baron Johann Wulffsohn, who resided at Vancouver, B. C., acting in that capacity. To provide a carrier to bring the merchandise so purchased to Seattle, the respondent authorized Wulffsohn to charter the ship Muskoka, on terms and conditions specified. Wulffsohn authorized the libelant to charter the ship in his own name. The libelant under authority from the respondent, through Wulffsohn as intermediary, entered into a contract with her owners for the hire of that vessel to carry a cargo of cement and salt from Hamburg to Seattle. At the time of the transaction the ship was supposed to be at sea, bound from a South American port to Hamburg, and due to arrive about the 15th of March, 1904, but being disabled in a storm she was compelled to deviate from her course, going to Valparaiso for repairs, and as a consequence of that mishap, notwithstanding due diligence in making necessary repairs, her arrival at Hamburg was delayed until May 5th. The respondent refused to accept the charter party when tendered and refused to load the ship and refused to pay the amount demanded by the owners for cancellation of the charter party. The ship was chartered to other parties at a rate very much lower than the rate which the libelant agreed to pay. The libelant and Wulffsohn expended considerable money for telegrams, traveling expenses, brokerage fees, and legal expenses incidental to the business of chartering the vessel, and compromising with the owners. Being advised that he was leagily obligated by the charter party, the libelant settled with the owners on the best terms which he could make with them, and to be released paid £700 sterling, and the respondent has refused to reimburse him.

By exceptions to the libel and in the argument on the final hearing, the respondent disputes the jurisdiction of the court, maintaining that the libel sets forth a demand by an agent against his principal for compensation for services rendered and reimbursement for expenses incurred, all incidental to a proposed hiring of a ship; that the services rendered were not maritime services, and that whatever contract, express or implied, may have existed, was not a maritime contract, and the controversy to be decided is not cognizable in a court of admiralty jurisdiction.

It must be conceded that a suit to collect brokerage and money expended in negotiating a charter party is not a case of admiralty and maritime jurisdiction, and not cognizable in a court of admiralty of this country. The Tribune, Fed. Cas No. 14,171; The Humboldt (D. C.)

86 Fed. 351; The Retriever (D. C.) 93 Fed. 480; Taylor v. Weir (D. C.) 110 Fed. 1005.

Nevertheless, this court overruled the exceptions to the libel, and now maintains that it has jurisdiction of the cause, for the reason that the libelant's pleading must be interpreted to mean that the libelant pursuant to authorization from the respondent executed the charter party as a represenative of the respondent, so that the respondent, being the beneficiary of the contract, became obligated as a principal contracting party, and by breach of the contract became legally obligated to the owners for the amount of damages recoverable, and that the libelant, being also obligated by reason of having executed the contract in his own name, was compelled to satisfy the demand of the owners, and, having done so, became, by the principles of equity, subrogated to their rights as against the real charterer of the ship; therefore the suit is founded upon a charter party, which is a maritime contract. The libelant, having invoked the jurisdiction of this court, must win or lose upon this theory, because any different theory, consistent with the allegations of the libel, must lead to the conclusion that the controversy is determinable by application of the common law, and that the respondent is entitled to have it submitted to a jury for decision. That is to say, the case must be dismissed for lack of jurisdiction. By the respondent's answer, evidence, and arguments it is admitted that it authorized Wulffsohn to charter the Muskoka, and I find that the ground of the controversy between the parties comprehends only the particular terms and conditions of the contract, and that the question to be decided is whether the respondent by an authorized agent assented to certain clauses in the contract on which the suit is founded. The case is similar to Starr & Co. v. Galgate Ship Co., 68 Fed. 234, 15 C. C. A. 366, which was a suit in admiralty, in which the main question was whether a charter party executed in a foreign country, by an agent in behalf of the charterer, one of the terms of which varied from the charterer's instructions given to a correspondent of the signer, constituted a valid contract, and, although no question as to the jurisdiction appears to have been litigated in that case, it is a precedent for maintenance of jurisdiction to decide a similar question in this case.

The respondent repudiated the charter party because of two objectionable clauses therein, which read as follows:

"The vessel to proceed with all safe speed direct to port of discharge, and deliver the cargo at two wharves, if required, *the cost of towage from one wharf to the other being for merchants account.* * * * Lay days not to commence to count before 25 March, 1904, unless vessel and cargo both ready sooner, and charterers to have the option of canceling this charter party if vessel not arrived and ready to commence loading by 31 May, 1904."

It is necessary to a proper understanding of the respondent's objections to explain that a printed blank was used, that a period after the word "required" was converted into a comma, and that the words underscored were written, making an addition to the clause, and that the canceling date was written in a blank space.

The respondent asserts that it did not authorize either Wulffsohn or the libelant to make or accept a charter party making its option to have the cargo discharged upon two wharves dependent upon payment

of the cost of towage, and limiting its option to cancel the charter party for delay, so as to allow the ship until May 31st to get ready to commence loading at Hamburg.

On the libelant's part, the item as to cost of towage is treated as being too trivial to constitute a defense; but, as the owners of the ship deemed it to be of enough importance to insist upon making it one of the terms of the contract, it is material, and they could not prevail in a suit against the respondent, without proving that the minds of the contracting parties met and assented to each and every one of the terms and conditions stipulated in the charter party. Compania Bilbaina, etc., v. Spanish-American, etc., Co., 146 U. S. 483, 13 Sup. Ct. 142, 36 L. Ed. 1054; Starr & Co. v. Galgate Ship Co., 68 Fed. 234, 15 C. C. A. 366.

With regard to the canceling date, the argument made in behalf of the libelant is: That, as both parties knew that the ship was enroute from a distant port to Hamburg, the respondent assumed the risk of her detention by unavoidable causes; that the voyage to the loading port was prosecuted with diligence, and the owner took no unfair advantage by withholding the ship, but she was delayed by unavoidable causes; that the necessary repairs were made with due diligence, and she did arrive and was promptly tendered to the libelant for loading, so that the respondent was not in any wise prejudiced by reason of the canceling date written in the charter party; therefore it is unimportant.

This argument circulates around, but does not touch, the vital point raised by the pleadings. The question to be decided is: Did the charter party, when it was signed by the libelant, have force, and virtue to bind the respondent? All acts of the owners of the ship subsequent to the signing and all possible excuses for nonperformance of a valid contract by the respondent are irrelevant to this issue, for the validity of the charter party must be determined by its contents and the circumstances under which it was executed. The rule of law which casts upon the charterer the risk of unavoidable delay of a ship in arriving at the loading port is not so rigid that it may not yield to circumstances. In the case of Fearing v. Cheeseman, Fed. Cas. No. 4,710, Mr. Justice Clifford stated the rule in the following words:

"The implied obligation of reasonable despatch in proceeding to the place of loading must be considered in connection with the express exception of the perils of the seas and navigation. Such an implied covenant in a charter party is not a condition precedent, which if broken will justify the charterer in disregarding all his covenants and promises, unless the delay is so great that it deprives the charterer of the whole benefit of the contract, or entirely frustrates the object he had in view in chartering the vessel."

As recited in this excerpt, the rule has a reasonable limitation, and a charterer would not be obligated to accept the ship if, by excessive delay, the object which he had in view had been frustrated, so that he would be deprived of all beneficial use of her. This is substantially different from the stipulation contained in the charter party which the libelant executed, for by its terms, regardless of the object which the respondent had in chartering the Muskoka, the canceling date fixed absolutely the period of grace which the owners might take advantage of. This is an important feature of the contract, and, if the libelant

exceeded his authority as an agent in agreeing to an absolute date, the respondent cannot be held to have given its assent to that stipulation, and upon the rule sanctioned by the authorities above cited, that a written contract cannot be void as to some of its terms and binding as to others, and unless the minds of the parties met, and there was mutual assent to every one of its terms, the instrument is entirely void, the respondent had a lawful right to reject this charter party when apprised of its contents and terms.

For the reasons which I have stated the court decides that the respondent's contention (if sustained by the evidence) constitutes a valid and complete defense.

In order to reach a conclusion as to whether the respondent did or did not authorize the execution of a charter party containing the above-mentioned conditions, the circumstances which affected the transaction, as well as the correspondence between the respondent and Wulff-sohn, must be considered, and it is necessary to keep in mind the fact that there was no direct communication between the libelant and the respondent. Wulffsohn was the German consul, residing at Vancouver, B. C., and intimately associated with the libelant in the brokerage business. If they were not partners, they were correspondents, and co-operated with each other in that business, and they were interested in placing merchandise of European production on the market of Seattle for the profit they could make on sales as well as commissions to be earned by chartering ships. The respondent was doing a mercantile business at Seattle, and desirous of expanding its business as an importer of foreign merchandise. Preliminary to the correspondence relating to the chartering of the Muskoka, there had been conversations between the managers of respondent and Wulffsohn relating to the purchase of cement of the kind designated as "Flying Cask" cement and salt, and, before placing with Wulffsohn a definite order for the purchase of a ship load of these commodities, inquiry was made to ascertain if a ship could be chartered to load at Hamburg in January or February, 1904, and Wulffsohn obtained through the libelant an offer of the Muskoka, which was expected to arrive at Hamburg in time to load during the month of March. The most definite information obtainable in regard to the position of the ship at the time was that she had sailed from Junin on the coast of South America, for Hamburg, on the 18th of November, 1903. It was understood by the parties that an early sailing date was an important factor in the negotiations, for the reason that unless the cargo could be delivered in time for the fall trade it would probably have to be carried over the winter season, which would be a detriment to the respondent, involving the risk of loss by fluctuations in the price of the commodities as well as interest on the capital invested and insurance. In the negotiations it was contemplated that a charter party, if made, would conform, generally, to the printed blank known as the "Hamburg-Californian Charter Party." Promptness in loading, sailing, and discharging the cargo is an important factor in every contract for the hire of a ship. These are the circumstances and conditions to be kept in view in reading and construing the following correspondence pursuant to which the charter party was executed at Hamburg:

"Seattle, Wn., Dec. 16, 1903.

"Mr. Johann Wulffsohn, City—Dear Sir: Confirming our conversation, we this day make you a firm offer, good for ten days, of five shillings per barrel for Flying Cask cement, freight rate not to exceed fifteen shillings, and $3.60 per ton for salt. The understanding is that the cargo may contain from 12,-000 to 18,000 barrels of cement, and in the neighborhood of 500 tons of salt. Shipment to be made in January or February, 1904.

"Yours respectfully,          Galbraith, Bacon & Company,
                                        "Per ———."

"Seattle, Wn., Dec. 23, 1903.

"Mr. J. Wulffsohn, City—Dear Sir: Confirming our yesterday's conversation with you, in which we authorized you to charter on our behalf, the ship Muskoka expected to load in March, 1904, at Hamburg for Seattle, at the freight rate of sixteen shillings per ton; we now confirm the same, and also confirm purchase from you today of Cement and Salt to be shipped on the Muskoka, as follows: Flying Cask cement at five shillings one and one-half pence per barrel. Salt at not over fifteen shillings per ton of 2,240 pounds, all f. o. b. ship at Hamburg. It is understood that the salt will not exceed 500 tons, in amount, and perhaps will be less than that amount, the balance of the cargo to be Flying Cask cement. It is further agreed and understood that we are to have one-half of the 2½ per cent. address commission; also, that we are to receive port agency fee amounting to $100.00.

"Yours respectfuly,          Galbraith, Bacon & Company,
                                        "[Signed]  Per C. H. B."

"Seattle, Washington, Dec. 24, 1903.

"Messrs. Galbraith, Bacon & Co., City—Gentlemen: Confirming my respects to you of this morning, I now beg to advise you that I have just received a cablegram from my Hamburg friend informing me that the charter of S/V Muskoka on your behalf has been closed. Trusting that this first transaction may be the commencement of a pleasant and mutually advantageous relation between us, I remain, gentlemen, wishing you the compliments of the season.

"Yours very truly,                    [Signed]  Johann Wulffsohn."

"Seattle, Washington, Dec. 24, 1903.

"Messrs. Galbraith, Bacon & Co., City—Gentlemen: I beg to acknowledge the receipt of your favor of the 23d inst., in which you put on record the rate of freight and conditions at which you have authorized me to charter on your behalf, the S/V Muskoka and also confirming the purchase from me of a cargo of cement and salt to be shipped in said vessel and f. o. b. prices to be paid by you for same, and further stating the proportion of cement and salt to be shipped. All of which I find in order and beg to confirm hereby. I notice that in your letter, under reply, you have overlooked to confirm the terms of payment as arranged and agreed between us and which are as follows, viz.: You agree to furnish me with a letter of credit on Hamburg or arrange through your bank here to open a credit with the Bank in Hamburg for the amount of your purchase, plus insurance (if insured over there) and also for the one-half of the freight, payable in Hamburg on signing of bill of lading. The price for the cement and salt is net payable at Hamburg in exchange against shipping documents. On the half of the charter money you are to be allowed a discount of 6 per cent. for interest and insurance. All bank charges, if any, to be entirely on your account. I shall be glad to have your confirmation of the above at your earliest convenience, and also the name of the Bank in Hamburg at which the credit will be opened, so that I can advise Mr. Paul Adler.

"Very truly yours,                    [Signed]  Johann Wulffsohn."

"Seattle, Wn., Dec. 24, 1903.

"Mr. J. Wulffsohn, City—Dear Sir: We beg to acknowledge receipt of your letter of this date to us confirming the terms of our purchase from you of

cement and salt, and as it is in accordance with our understanding, we now hereby confirm the same.

"Yours respectfully,          Galbraith, Bacon & Company,
"[Signed]   Per J. E. Galbraith."

These letters constitute the agreement between the respondent and Wulffsohn, and they contain all the terms thereof except the printed clauses of the Hamburg-Californian form of charter party, which are implied terms. And this contract, including the implied terms, defines the extent and limitations of Wulffsohn's authority to charter the Muskoka for the respondent. It is to be noted that this agreement was made at Seattle, that the authority to charter the Muskoka was incidental to the purchase of a cargo of cement and salt, and given to Wulffsohn personally, and did not include general discretionary power, nor special authorization, to assent to any terms not indicated by the correspondence or the printed form, nor to fix absolutely the date to which the charterer's option to cancel the charter party should be postponed. The libelant, in acting as the representative of the respondent, was but a subagent having only the same power that the respondent conferred by its contract with Wulffsohn. He assumed discretionary power in making the charter party containing the clauses to which the respondent objects, and it is the decision of the court that by doing so he exceeded his authority, and that the respondent had a lawful right to reject the charter party for that reason.

A certified copy of the charter party was sent by Wulffsohn to the respondent on January 30, 1904. It was received on February 3d. On the same day the respondent rejected and returned it, and by a telegram and letter informed Wulffsohn of its determination to reject, and in the letter assigned the unwarranted assumption of authority, and the two objectionable clauses as grounds for repudiating it. Until that date the respondent could not have become obligated to accept the charter party by ratification of the unauthorized act of the libelant in assenting to the stipulation covering the cost of towage and in fixing May 31st as the canceling date. This is so because until then it did not have knowledge of the facts. A principal cannot be held to have ratified an unauthorized act of an agent without proof of a declaration made, or of an act, whereby he expresses definitely his intention to ratify after he has acquired true information of all the material facts of the transaction. This is an elementary principle of the law of this country. 1 Amer. & Eng. Encyc. of Law (2d Ed.) 1189. The laws of this country, rather than the laws of Germany, are controlling in this case, for the reasons that the only authority for chartering the Muskoka on the respondent's behalf was conferred by a contract made at Seattle, all of the respondent's transactions, declarations, and communications were with Wulffsohn, and by being associated together, as above stated, the libelant and Wulffsohn must be regarded as one and the same party, so far as the respondent's rights and obligations involved in this lawsuit are concerned; otherwise the libelant was not an agent of the respondent for any purpose whatever, and his cause is groundless, so that necessarily his claims are subject to the laws of this country.

At all times and in all of its communications after the receipt of the

charter party the respondent was steadfast in refusing to accept it. Therefore there is no foundation upon which a finding that it was ratified with knowledge of its terms can be predicated.

Discussion of the correspondence which passed between the respondent and Wulffsohn, subsequently to December 24, 1903, would lead to no conclusion beneficial to the libelant. Therefore I refrain, except to say: That the proctors for the libelant wisely omitted to plead the supposed general custom, allowing a chartered ship from 30 to 90 days to reach her loading port after the probable date on which she would be due to arrive, which Wulffsohn lays stress upon in his letters. This custom, if it were pleaded and proved, would be considered as a reasonable and flexible rule, and if it were read into the charter party the respondent would be entitled to have the urgency for an early sailing date considered as one of the circumstances affecting the time allowance. Lowber v. Bangs, 2 Wall. (U. S.) 728, 17 L. Ed. 768. And in view of all the material circumstances 30 days might be the limit. Whether that or a longer period would be allowable, the custom is one thing and the time allowance as limited by the canceling date is different, and an agent's power to fix a canceling date without consulting his principal cannot be supported by the custom.

In a general view of the whole case, it appears to be without merit, and the reasons for denying relief to the libelant are ample. In addition to strictly legal grounds of defense relied upon, it is to be observed that the libelant in accepting an agency became bound to act in good faith and with business prudence; but, instead of doing so, he improvidently chartered the Muskoka, allowing her the privilege of loading in June a cargo which he bought simultaneously to be delivered for shipment in March. He withheld from the respondent for an unreasonable time information as to the exact date to which its right to cancel the charter party for delay was postponed. When the respondent refused to accept the charter party, the libelant endeavored to extricate himself from complications by obtaining the opinions of experts and a German lawyer, the expense of which he has endeavored in this lawsuit to cast upon the respondent, although it would appear from the advice given that the questions submitted evaded entirely the point at issue as to his rights as a special agent, under the authority conferred by the correspondence between the respondent and Wulffsohn. On the 9th day of May, 1904, the libelant, through Wulffsohn, gave the respondent an ultimatum to either load the Muskoka, pay £1,000 sterling for canceling the charter party, or be held for "all damage, loss, expense, costs and attorney's fees that may be incurred," and on May 14, 1904, a certificate canceling the charter party was signed and sworn to by himself and an agent of the owners, which declares that by mutual consent the charter party was canceled May 10th, "and that Mr. Paul Adler has handed a cheque for £1,000 (one thousand pounds British Str.) to the owners," whereas, in fact he compromised with the owners by the payment of £700 sterling, and the presumption is almost conclusive that there was an attempt on his part, by connivance with an agent of the owners, to mulct the respondent for £300 in excess of the amount actually paid. In his deposition the libelant complains bitterly of delay on the part of the re-

spondent in giving notice in definite form of its rejection of the charter party, and he asserts that 'in the beginning of January he could have secured the owners' consent to cancellation by paying them £56, and he pretends to think that if he had taken advantage of his opportunity then, acting upon his own initiative, he would have made himself liable to the respondent. This complaint brings into clear view his inexcusable negligence in failing to promptly acquaint the respondent with the terms of the charter party. If he had given that information as early as he gave news of the detention of the Muskoka at Valparaiso, he would have received a definite notice of the rejection of the charter party in the first days of January, or, if not, he could upon just and legal grounds claim that by failure to reject promptly the respondent elected to accept it and become obligated to observe all of its terms. He certainly would have no cause to regret the decision this court would render, if there had been any dalliance on the part of the respondent after being apprised of the terms of the charter party, and if the libelant had not been dishonest in demanding a larger sum than he was required to pay for its cancellation. As stated in the beginning of this opinion, this case must be determined according to the principles of equity, and the libelant is not entitled to equitable relief in view of the evidence showing that these transactions with the respondent are not free from the taint of fraud.

Let a decree be entered that the libelant take nothing, and that this suit be dismissed, with costs.